859 F.2d 820
 MESSIAH BAPTIST CHURCH, a Colorado non-profit corporation;
Thom Moore; Ardel Moore; Donna L. Nive; and
Jess Paulsen, Plaintiffs-Appellants,
v.
The COUNTY OF JEFFERSON, STATE OF COLORADO, the Board of
County Commissioners of the County of Jefferson, State of
Colorado; Hal Anderson, Bob Clement, and James Martin, not
individually but as members of the Board of County
Commissioners of the County of Jefferson, State of Colorado,
Defendants- Appellees.
 No. 87-1634.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 6, 1988.
 
 Ronald S. Loser (J. Scott Needham, with him on the briefs), of Loser, Davies, Magoon & Fitzgerald, P.C., Denver, Colo., for plaintiffs-appellants.
 Gay B. Ummel (Patrick R. Mahan, Co. Atty., with her on the briefs), Asst. County Atty, Golden, Colo., for defendants-appellees.
 Before McKAY, TACHA and BRORBY, Circuit Judges.
 BRORBY, Circuit Judge.
 
 
 1
 The Messiah Baptist Church and various individuals representing a class ("Church") filed an action for damages under 42 U.S.C. Sec. 1983 against Jefferson County, Colorado, and its Board of Commissioners ("County"). The Church contends the zoning regulations enacted by the County are facially unconstitutional under the Due Process Clause of the Fourteenth Amendment and the Free Exercise Clause of the First Amendment. The Church also contends the special-use provisions added to the zoning regulations by amendment in 1976 arose from an unconstitutional delegation of power.
 
 
 2
 Both parties moved for summary judgment below. The district court upheld the constitutionality of the zoning regulations, granted the County's motion and denied the Church's motion for summary judgment. From this order the Church appeals.
 
 
 3
 We AFFIRM.
 
 FACTS
 
 4
 In July 1974, the Church purchased approximately eighty acres of vacant land in Jefferson County, Colorado. The land was located in an area of the County which was zoned Agricultural Two District (A-2). The A-2 zoning district allowed general ranching, intensive agricultural use, and agriculturally related uses while protecting the surrounding land from harmful results. Land in the A-2 zoning district could be used for dwellings, barns, stables, poultry hatcheries, dairy farms, greenhouses, roadside stands, feedlots, feeding garbage to hogs, veterinarian hospitals, and the storage of manure and related uses. Land in the A-2 zoning district could not be used for schools, community buildings, and churches, even as special uses.
 
 
 5
 In 1974, the zoning regulations provided for twenty-five zoning districts. Sixteen of these districts authorized a residential use in some form. Of the sixteen zoning districts authorizing residential uses, thirteen specifically authorized a church use as a matter of right. The remaining nine zoning districts were devoted to agricultural, commercial, and industrial uses and did not allow residential uses of any type. With the exception of zoning districts A-1 and A-2, a church was an authorized use by right in every zoning district which authorized permanent residential use.
 
 
 6
 In September 1974, the Church applied for a building permit to erect a single structure which was to be used for worship, administrative offices, and school purposes. The application was denied, and the Church apparently attempted to appeal this decision to the County. The record, however, is silent as to whether or not any direct action was taken by the Church concerning its appeal.
 
 
 7
 Two years later, in July 1976, the County amended the A-2 zoning regulations to authorize church uses by special-use permit, subject to approval by the planning commission and the County. Shortly after this amendment, the Church filed an application for a special-use permit indicating an intent to develop its entire eighty acres. The Church subsequently withdrew this application.
 
 
 8
 In April 1978, the Church again applied for a special-use permit, this time to build a 12,000 square foot structure to be used for worship services, administrative offices, classrooms, recreation (gymnasium) purposes, parking areas for 151 vehicles, and an "amphitheater" where worshipers could park and, without leaving their cars, listen to religious services through means of individual sound transmission devices similar to those used by "drive-in" movie theaters.
 
 
 9
 In May 1978, a public hearing was held before the planning commission concerning the Church's second application for a special-use permit. The planning commission denied the special-use permit, reduced to writing the nine reasons for the denial, which included access problems, erosion hazards, and the fact that fire protection for the site was wholly inadequate.
 
 Due Process
 
 10
 The Church argues that the 1974 A-2 regulations are unconstitutional on their face because they deprive the Church of the right to use its property in violation of the Due Process Clause of the Fourteenth Amendment.
 
 
 11
 The principal test for measuring the constitutionality of a zoning ordinance under the Due Process Clause is set forth in Village of Euclid, Ohio v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). In this case, the owner of a sixty-eight acre tract of vacant land sought to use his land for industrial purposes. The city zoned a portion of the sixty-eight acres for residential uses, and the owner attacked the ordinances on due process grounds. The Supreme Court upheld the zoning ordinances and stated that before a zoning ordinance can be declared unconstitutional on due process grounds, the provisions must be clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals, or general welfare. Id. at 395, 47 S.Ct. at 121. The Court further held that if the validity of the land classification is "fairly debatable," the legislative judgment must control. Id. at 388, 47 S.Ct. at 118.
 
 
 12
 The Church seems to contend first that the A-2 zoning regulations are arbitrary because they permit dwellings but exclude churches from the agricultural district. The Church cites numerous state court decisions including City of Englewood v. Apostolic Christian Church, 146 Colo. 374, 362 P.2d 172 (1961), purportedly holding that exclusion of churches from residential areas constitutes arbitrary action. (It should be noted that Englewood was overruled in part, City of Colorado Springs v. Blanche, 761 P.2d 212 (Colo.1988), after the briefs were filed.) The state court cases cited by the Church are distinguishable on the facts from the case now before us. In Englewood, the regulations excluded churches as a use by right from all residential zone districts except the multifamily district. In the instant case, however, the regulations permit church use as a use by right in all but three residential districts. Consequently, the zoning scheme is clearly distinguishable.
 
 
 13
 Even if Englewood factually were on point, other state cases hold that the exclusion of churches from residential zoning districts is constitutionally permissible. See Corporation of Presiding Bishop of Church of Jesus Christ of Latter-Day Saints v. City of Porterville, 90 Cal.App.2d 656, 203 P.2d 823, appeal dismissed, 338 U.S. 805, 70 S.Ct. 78, 94 L.Ed. 487 (1949). In our view, the better reasoned state court decisions hold that exclusion of churches from particular zoning districts, whether agricultural or residential, is not arbitrary per se.
 
 
 14
 The Church next argues that the A-2 regulations are arbitrary because they exclude churches but permit large agriculturally related commercial uses in the agricultural district. The Church contends that these commercial uses are at least as intensive as those uses proposed by the Church. In our view, however, the fact that the County's regulatory scheme is one of true differentiation does not render it arbitrary. The agricultural zones permit true and unfettered agricultural uses, and the decision as to what is or is not a compatible use therein is a decision which belongs to the legislative body. If the validity of the legislative classification is "fairly debatable," the legislative judgment must control. Euclid, 272 U.S. at 388, 47 S.Ct. at 118. The Church has not established that the County's choice of compatible uses is unreasonable.
 
 
 15
 Finally, the Church asserts the court must review the due process challenge to the A-2 zoning regulations under the strict scrutiny standard rather than the reasonable relationship standard because the zoning regulation infringes the Church's First Amendment rights to exercise a religious preference. The Church further contends that the burden, therefore, is upon the parties seeking to uphold the regulation to demonstrate that it serves a compelling state interest and is narrowly drawn to address only the state interests at stake. Schad v. Borough of Mount Ephraim, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981).
 
 
 16
 In the instant case, however, the Church has not been denied the right to exercise a religious preference. Rather, the Church has been denied a building permit, and may not construct its house of worship where it pleases. That fact standing alone does not amount to a denial of the exercise of a religious preference. (See discussion of Free Exercise of Religion within.)
 
 
 17
 The record contains no evidence that the zoning regulations infringe upon any protected liberty. The A-2 zoning regulations affect only property interests and, therefore, need only bear a substantial relationship to the general welfare. Euclid, 272 U.S. at 391, 395, 47 S.Ct. at 119, 120. There can be little doubt that the zoning regulations bear a substantial relationship to the general welfare of the residents of Jefferson County. There is nothing arbitrary or unreasonable about precluding the building of a church near a feedlot or near hogs rooting through garbage. We hold that the 1974 A-2 zoning regulations are valid under the Due Process Clause.
 
 Free Exercise of Religion
 
 18
 The Church contends that the 1974 A-2 zoning regulations are invalid on their face because they preclude the Church from building a house of worship on its property located within the A-2 zoning district. This court approaches the issue mindful of the often competing values of free exercise of religion and effective use by the state of its police powers. "[W]hen entering the area of religious freedom, we must be fully cognizant of the particular protection that the Constitution has accorded it. Abhorrence of religious persecution and intolerance is a basic part of our heritage." Braunfeld v. Brown, 366 U.S. 599, 606, 81 S.Ct. 1144, 1147, 6 L.Ed.2d 563 (1961). On the other hand, in Schad, 452 U.S. at 68, 101 S.Ct. at 2182, the Court stated: "The power of local governments to zone and control land use is undoubtedly broad and its proper exercise is an essential aspect of achieving a satisfactory quality of life in both urban and rural communities." To complicate matters, we analyze the issue against a fluid precedent. As the Eleventh Circuit observed, "[i]nterpretation and application of the free exercise clause has created, within that field of constitutional doctrine, areas dotted by unanswered questions." Grosz v. City of Miami Beach, Fla., 721 F.2d 729, 733 (11th Cir.1983), cert. denied, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984). We seek to approach the issue with sensitivity to the many evolving standards applicable to the case.
 
 
 19
 From 1974 to present, the A-2 zoning regulations did not permit church uses by right. In 1976, the County amended the A-2 regulations to allow the church uses upon approval of a special-use permit. In 1978, the Church applied for a special-use permit which was denied after a public hearing. Consequently, the Church was unable to construct its house of worship on its property located within the A-2 zoning district.
 
 
 20
 The first question to be addressed is whether the A-2 zoning regulations regulate religious beliefs. If they regulate religious beliefs, as opposed to religious conduct, then the regulations are unconstitutional. "[T]he [First] Amendment embraces two concepts,--freedom to believe and freedom to act. The first is absolute...." Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940). Courts consistently distinguish religious beliefs from religious conduct. "The belief/conduct distinction has survived." Grosz, 721 F.2d at 733 n. 5. As to what constitutes regulation of beliefs, the Supreme Court recently quoted from Sherbert v. Verner, 374 U.S. 398, 412, 83 S.Ct. 1790, 1798, 10 L.Ed.2d 965 (1963), and reiterated the concept that the free exercise clause prohibits the government from coercing the individual to violate his beliefs, and further stated: "The Free Exercise Clause is written in terms of what the government cannot do to the individual, not in terms of what the individual can exact from the government." Lyng v. Northwest Indian Cemetery Protective Ass'n, --- U.S. ----, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988). One of the clear points of precedent is that the government may not use its power to interfere with or regulate the individual's religious beliefs.
 
 
 21
 The A-2 zoning regulations do not in any way regulate the religious beliefs of the Church. Nothing in the record shows any friction between the religious beliefs of the Church and the zoning regulations. Consequently, we proceed to the next inquiry.
 
 
 22
 Do the regulations impermissibly regulate religious conduct? Generally speaking, the government may regulate religious conduct. "It is true that activities of individuals, even when religiously based, are often subject to regulation by the States in the exercise of their undoubted power to promote the health, safety, and general welfare, or the Federal Government in the exercise of its delegated powers." Wisconsin v. Yoder, 406 U.S. 205, 220, 92 S.Ct. 1526, 1535, 32 L.Ed.2d 15 (1972). However, conduct flowing from religious beliefs merits protection when shown to be integrally related to underlying religious beliefs. In Yoder, the Court explained: "[W]e see that the record in this case abundantly supports the claim that the traditional way of life of the Amish is not merely a matter of personal preference, but one of deep religious conviction, shared by an organized group, and intimately related to daily living." Id. at 216, 92 S.Ct. at 1533.
 
 
 23
 By contrast, the record in our case discloses no evidence that the construction of a house of worship on the property in the A-2 zoning district is integrally related to underlying religious beliefs of the Church. The Church argues that constructing its house of worship is intimately bound to its religious tenets. As an abstract argument, this proposition is true. The evidence in the record, however, fails to establish any basis for this contention. The Church makes only a vague reference to a preference for a pastoral setting, but such is of no consequence to this analysis. What is important is that the record contains no evidence that building a church or building a church on the particular site is intimately related to the religious tenets of the church. At most, the record discloses the Church's preference is to construct its house of worship upon its land. We agree with the observation of the Sixth Circuit in Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio, 699 F.2d 303, 307, cert. denied, 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983), that "building and owning a church is a desirable accessory of worship, not a fundamental tenet of the Congregation's religious beliefs." In short, under the facts of this case, the A-2 zoning regulations do not regulate any religious conduct of the church or its members.
 
 
 24
 We must also consider whether the zoning regulations place any burden on the free exercise of appellant's religion. "If the purpose or effect of the law is to impede the observance of one or all religions or is to discriminate invidiously between religions, that law is constitutionally invalid even though the burden may be characterized as being only indirect." Braunfeld, 366 U.S. at 607, 81 S.Ct. at 1148. In our case, the record reveals that neither the purpose nor the effect of the zoning regulations is to impede observance or discriminate between religions. Regulation of the location of church construction is not an impediment to religious observance in the sense of a prohibition. Arguably, the zoning regulations affect secular activity and make the practice of religion more expensive, and therefore impose an indirect burden on the exercise of religion. Even assuming that the effect of the regulations is to add expense to the practice of religion, this indirect burden does not invalidate the zoning regulations if the state cannot accomplish its purpose by means which do not impose such a burden. Id. at 607, 81 S.Ct. at 1148. In holding that the zoning ordinance which did not permit church buildings within a particular zoning district did not infringe the Congregation's freedom of religion, the Lakewood court simply characterized construction as a secular activity which made the practice of religious beliefs more expensive. The court then observed that the ordinance did not pressure the Congregation to abandon its religious beliefs through financial or criminal penalties, and does not "tax" the exercise of religion. Lakewood, 699 F.2d at 307.
 
 
 25
 While we do not fully adopt the approach of the court in Lakewood (Lakewood assumes Braunfeld created a presumption of validity for governmental actions that impose only an indirect burden), we agree that the financial consequences to the church do not rise to infringement of religious freedom. As the court stated in Lakewood, id. at 307, "the First Amendment does not require the City to make all land or even the cheapest or most beautiful land available to churches." We agree.
 
 
 26
 Our inquiry, however, goes beyond Lakewood. Under Braunfeld, as explained in Sherbert, 374 U.S. at 398, 83 S.Ct. at 1790, and Thomas v. Review Bd. of the Ind. Employment Sec. Div., 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981), we consider whether an alternative means exists whereby the County may accomplish its purpose by means which do not impose an indirect burden. Without question, the zoning district plan, one of true differentiation and upheld as sound under the due process analysis, cannot be implemented effectively without the resulting financial burden on the Church. When the burden imposed by the government rests on conduct rooted only in secular philosophy or personal preference, however, the scale always reads in favor of upholding the government action. Grosz, 721 F.2d at 737. Since the governmental action of adopting and implementing the zoning regulations does not affect religious practice, the indirect burden does not render the zoning regulations constitutionally infirm.
 
 
 27
 We hold that the 1974 Jefferson County A-2 zoning regulations do not violate the Church's First Amendment rights. We do not hold that the act of building is per se that of secular conduct. We limit our holding to the record before us; a record which shows no conflict between the zoning ordinances and the religious tenets or practices of this Church. This is not a case where the church must choose between criminal penalties or foregoing government benefits and its religious benefits such as is apparent in Yoder, 406 U.S. at 218, 92 S.Ct. at 1534, or Sherbert, 374 U.S. at 404, 83 S.Ct. at 1794. This case does not involve the compromise of the Church's fundamental tenets such as was involved in Heffron v. Int'l Soc'y for Krishna Consciousness, Inc., 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). In short, there is no infringement of the Church's religious freedom. A church has no constitutional right to be free from reasonable zoning regulations nor does a church have a constitutional right to build its house of worship where it pleases. Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971).
 
 Unconstitutional Delegation
 
 28
 The Church argues that the special-use provisions of the 1976 Jefferson County A-2 zoning regulations are constitutionally infirm. The Church claims that the regulations arise from legislation which conveys discretionary authority over conduct protected by the First Amendment and, therefore, the legislation must set forth narrow, objective, and definite standards to guide the decision-making body. The Church's entire argument on First Amendment activity is immaterial to this opinion because the zoning regulations do not affect First Amendment rights.
 
 
 29
 The Church next argues that the 1976 zoning regulations fail to meet the test for adequacy of delegation as established under Colorado law. We conclude to the contrary.
 
 
 30
 The State of Colorado has enacted a comprehensive County Planning and Building Code. See Colo.Rev.Stat. Sec. 30-28-101 through Sec. 30-28-204 (1973) concerning the standards to be followed in establishing zoning regulations and classifications. The Colorado legislature passed Colo.Rev.Stat. Sec. 30-28-115 (Supp.1976) which reads in part as follows:
 
 
 31
 (1) Such regulations shall be designed and enacted for the purpose of promoting the health, safety, morals, convenience, order, prosperity, or welfare of the present and future inhabitants of the state, including lessening the congestion in the streets or roads or reducing the waste of excessive amounts of roads, securing safety from fire, floodwaters, and other dangers, providing adequate light and air, classifying land uses and distributing land development and utilization, protecting the tax base, securing economy in governmental expenditures, fostering the state's agricultural and other industries, and protecting both urban and nonurban development.
 
 
 32
 The Colorado Legislature set forth further standards when it passed Colo.Rev.Stat. Sec. 31-23-303 (Supp.1975) which reads in part as follows:
 
 
 33
 (1) Such regulations shall be made in accordance with a comprehensive plan and designed to lessen congestion in the streets; to secure safety from fire, panic, floodwaters, and other dangers; to promote health and general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to promote energy conservation; and to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality.
 
 
 34
 Jefferson County in turn adopted the following standards:
 
 
 35
 In pursuance of the authority conferred by Chapter 92, Session Laws of Colorado, 1939, this resolution is enacted for the purpose of promoting the health, safety, morals, convenience, order, prosperity and welfare of the present and future inhabitants of Jefferson County, by lessening of congestion in the streets or roads, securing safety from fire and other dangers, providing light and air; avoiding undue congestion of population, facilitating the adequate provision of transportation, water, sewage, schools and other public requirements; securing protection of the tax base; and by other means in accordance with a comprehensive plan.
 
 
 36
 * * *
 
 
 37
 * * *
 
 A. Intent of Classification:
 
 38
 The Agricultural Two Zone District is designed to allow areas for general farming, ranching, intensive agricultural uses and agriculturally related uses while protecting the surrounding land from any harmful effects.
 
 
 39
 In promulgating the standards for the A-2 zoning regulations, the County specified uses, height regulations, minimum lot sizes of 10-acres; setback standards, provisions requiring odors to be more than 500 feet from the boundary of a residential district; and provisions concerning exotic animals, dangerous animals, and even stallions.
 
 
 40
 The Church relies upon the Colorado case of Beaver Meadows v. Bd. of County Comm'rs, 709 P.2d 928 (Colo.1985). In this case, a land developer submitted a proposal to create a planned unit development (PUD) to the board of county commissioners. The board approved the PUD proposal subject to several specified conditions. The court considered whether the state had authorized the county to impose the specified conditions. The court first determined that the county commissioners had this authority, and then considered whether the county had exercised its statutory authority properly. The court explained that the delegation and subsequent implementation of zoning power must evidence sufficient standards and procedural safeguards to insure that any action taken by a county in response to a land-use proposal would be rational and consistent and that judicial review of the action would be available and effective.
 
 
 41
 We have reviewed the legislation and the challenged regulations herein and hold, under Beaver Meadows, that the 1976 resolution does not arise from an unconstitutional delegation of discretionary power. We further hold that the pertinent Colorado statutes and the zoning regulations contain sufficient standards to adequately guard against arbitrary and capricious operation. The state statutes and county regulations quoted above contemplate the Board may consider various factors in regulating land use and the county is specifically authorized to classify land use. While the state statutes are quite broad, the county regulations for the A-2 district provide adequate standards for their implementation.
 
 
 42
 The County raised a further matter by way of defense in its brief; that the County has not caused any deprivation of the Church's constitutional rights and any injury which may have been suffered by the Church was the result of self-inflicted hardship. Under Magoc v. Hooker, 796 F.2d 377 (10th Cir.1986), we will not consider this argument for the reason that it was not presented to the court below.
 
 
 43
 The judgment of the district court is AFFIRMED.
 
 McKAY, Circuit Judge, dissenting:
 
 44
 This case involves a dispute over zoning restrictions placed by Jefferson County, Colorado, on places of worship.
 
 
 45
 In July 1974, the Messiah Baptist Church (Church) purchased approximately eighty acres of vacant land in Jefferson County, Colorado. The land was located in an area of the County which was zoned Agricultural Two District (A-2). The A-2 zoning district allowed general ranching, intensive agricultural use, and agriculturally-related uses. Land in the A-2 zoning district could be used for single-family dwellings, barns, stables, poultry hatcheries, fish hatcheries, dairy farms, forestry farms, fur farms, greenhouses, roadside stands, feedlots, dog kennels, catteries, veterinary hospitals, and certain other related uses. Land in the A-2 zoning district could not be used for schools, community buildings, and churches, even as special uses, under the 1974 zoning regulations.
 
 
 46
 In 1974, the Jefferson County zoning regulations provided for twenty-five zoning districts. Sixteen of these districts, including A-1, A-2, and R-T, authorized a residential use in some form. Even though churches were permitted as of right in every other zone where residences were permitted, churches were not permitted in the A-1, A-2, and R-T districts.
 
 
 47
 In September 1974, the Church applied for a building permit to erect a single structure which was to be used for worship, administrative offices, and school purposes. The application was denied. Two years later, in July 1976, the County amended the A-2 zoning regulations to authorize church uses by special-use permit, subject to approval of the planning commission and the County.
 
 
 48
 In April 1978, the Church applied for a special-use permit to build a 12,000 square foot structure to be used for worship services, administrative offices, classrooms, recreation purposes, parking areas for 151 vehicles, and an "amphitheater" where worshipers could park and, without leaving their cars, listen to religious services through means of individual sound transmission devices similar to those used by "drive-in" movie theaters.
 
 
 49
 A public hearing was held before the planning commission concerning the Church's application for a special-use permit. The planning commission denied the special-use permit. Without any attempt to suggest ways of eliminating or reducing its concerns, the commission gave nine reasons for the denial, which included access problems, erosion hazards, and the fact that fire protection for the site was inadequate. There are no constitutionally adequate standards in the ordinance which specifically guide the commission in its exercise of discretion to grant or deny a use permit for a place of worship in the subject zone.[1]
 
 
 50
 Places of worship have in almost all religions been as integral to their religion as have Sunday School, preaching, hymn singing, prayer, and other forms of worship which we have traditionally recognized as the "exercise" of religion.[2] Churches are the situs for the most sacred, traditional exercise of religion: baptisms, confirmations, marriages, funerals, sacramental services, ordinations, and rites of passage of all kinds.
 
 
 51
 In the free exercise context, churches serve much the same function as public forums do in the free speech context. Since time immemorial, citizens have gathered in public forums for speech and assembly purposes under the highest level of constitutional protection. The right to assemble or speak in a public forum cannot be absolutely prohibited, and may only be infringed by narrowly-drawn time, place, and manner restrictions. Similarly, the place of worship is central to the first amendment concept of free exercise as essentially the only place of religious "assembly" and the central place for the expression of religious "speech." Thus, when government agencies seek to encumber the use of buildings for religious worship, they are, in fact, impinging on speech, assembly, and religious exercise through the use of zoning ordinances. The impingement is the same as when government prohibits the use of buildings for live entertainment, see Schad, 452 U.S. 61, 101 S.Ct. 2176, 68 L.Ed.2d 671 (zoning ordinance prohibiting use of building for live entertainment anywhere in town found unconstitutional); the use of public forums, such as roads or sidewalks, for parades or protests, see United States v. Grace, 461 U.S. 171, 103 S.Ct. 1702, 75 L.Ed.2d 736 (1983), Shuttlesworth v. Burmingham, 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969), Hague v. CIO, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), and the use of property for other speech-related activities whether within or without buildings. See City of Lakewood v. Plain Dealer Publishing Co., --- U.S. ----, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988). The outright prohibition or the discretionary power (unaccompanied by adequate standards) to deny parade or protest permits on public property surely is not more odious to the first amendment than the outright prohibition or legally discretionary power to deny the right to use buildings for worship, religious communication, and religious assembly on one's own property.[3] As already suggested, to distinguish building permit cases such as the case at hand from those involving the "use" of already-existing buildings is facile.[4] What is at stake is the power of the County, through zoning ordinances, to prohibit legitimate and protected first amendment uses at particular locations. Recently, in a similar case, the Fifth Circuit properly refused to apply that kind of distinction where a Muslim church sought to use an existing building as its place of worship. Islamic Center of Mississippi, Inc. v. City of Starkville, 840 F.2d 293 (5th Cir.1988). Indeed, if first amendment free exercise rights are not triggered by the impingement on places of worship, the right of free exercise of religion is for practical purposes subject to broad infringement in all of its aspects except perhaps belief.
 
 
 52
 In these zoning cases involving places of worship, we have implicated at a minimum three different and cumulative interests recognized by the first amendment itself: speech, assembly, and religious exercise. In fact, insofar as I can discern, even the cases which have sustained zoning ordinances against free exercise claims have nearly always acknowledged some degree of encroachment upon free exercise interests.[5]
 
 
 53
 In noting the vital importance of places of worship to the free exercise of religion, the exercise of speech, and the exercise of the right to assemble, I do not here suggest that the state is powerless to regulate either the location or the use of places of worship. Nor is it necessary to this case or perhaps even wise to suggest that the correct standard to be applied is one of the highest standards known in the law, the compelling state interest. However, it would be inappropriate to continue to apply the lowest known standard--rational basis--to zoning ordinances, when they are used to prohibit the use of buildings as churches. See generally West Virginia State Board of Education v. Barnette, 319 U.S. 624, 639, 63 S.Ct. 1178, 1186, 87 L.Ed. 1628 (1943) ("The right of a State to regulate ... may well include, so far as the due process test is concerned, power to impose all of the restrictions which a legislature may have a 'rational basis' for adopting. But freedoms of speech and of press, of assembly, and of worship may not be infringed on such slender grounds.").
 
 
 54
 Property is not an unlimited commodity. Congregations pay an onerous price in time, money, and convenience when forced to select worship sites at a considerable distance from their homes. See, Islamic Center, 840 F.2d 293. Although other sites may be available, the first amendment demands that we know where, how many, how suitable, how convenient, and at what cost before we properly can judge the burden on exercise as compared to the burden on the state's legitimate interests.[6]
 
 
 55
 In cases involving the free exercise clause of the first amendment, courts typically have engaged in the characterization game by declaring which activities are "secular," "fundamental," or "integral." See, e.g., Grosz, 721 F.2d 729; Lakewood, 699 F.2d 303. Thus, it is not surprising that at least one other circuit, in a case with facts and issues very similar to the one before us, has characterized this type of dispute as one concerning the mere construction of a building and thus a secular activity. See Lakewood, 699 F.2d at 303. In Lakewood, as a result of the zoning ordinance, the congregation was prevented from building a church on its own property. The Sixth Circuit did not justify or explain its characterization, but rather declared that the restrictive zoning ordinance did not force the congregation to abandon its religious beliefs through financial coercion or criminal penalty and did not tax the exercise of religion. No consideration was given to the magnitude of the financial or convenience burden which an alternate site location might impose. It is not self-evident that an attempt to acquire and use an alternate site is always a trivial burden. Nor is it self-evident that a congregation's attendance pattern can be easily accommodated at an alternate site without substantial individual and collective burden.
 
 
 56
 Here, the majority opinion does not adopt quite such an extreme view but nonetheless targets the activity as implicating only minor or insignificant free exercise interests. Naturally, if we characterize the restricted activity as secular, there is no point to this litigation or to a discussion of the restrictions, since the minimum threshold of a rational basis, required in zoning cases not implicating the first amendment, can be satisfied so simply as to not admit of argument. See Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926). A colorable claim of infringement upon first amendment liberty demands more. " 'One is not to have the exercise of [one's] liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.' " Schad, 452 U.S. at 77, 101 S.Ct. at 2187 (citing Schneider v. State, 308 U.S. 147 at 163, 60 S.Ct. 146 at 151, 84 L.Ed. 155 (1939)). The facts of this case easily present such a colorable claim.
 
 
 57
 To claim that this case is only concerned with the construction of a building is to miss the point. Surely no one would contend that it would be constitutional to zone an entire state or for that matter the whole country so as to prohibit churches. Even the justices who would broadly uphold zoning of some first amendment activities have not endorsed such a sweeping view. See Schad, 452 U.S. at 85-88, 101 S.Ct. at 2191-92 (Burger, C.J., dissenting). Congregants would be free to hold whatever religious beliefs they chose, but none would have a house of worship in which to come together. Such a situation would undoubtedly infringe upon "free exercise."
 
 
 58
 Initially the Supreme Court analyzed free exercise cases in terms of whether they involved "belief" or "conduct," upholding the protection of religious "belief" while sometimes declaring certain "conduct" to be unprotected. Compare Wooley v. Maynard, 430 U.S. 705, 97 S.Ct. 1428, 51 L.Ed.2d 752 (1977); United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965), with Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1978); Cantwell v. Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). More recent Supreme Court decisions have broadened and added substance to the term "exercise." In my view, church-based "religious exercise" is as clearly protected under modern first amendment jurisprudence as is refusal to work on the Sabbath or refusal to send one's children to public schools. See Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). It seems to me that even under the pre-Sherbert/Yoder standards, the building, maintenance, and use of places of worship qualify for first amendment protection not only because housed worship has been historically central to religion but also because such activities necessarily involve speech and assembly.
 
 
 59
 The rational basis standard applicable under Euclid, 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303, trivializes the burdening role which zoning can and does play in the exercise of religious expression. On the other hand, the complexity of meeting the legitimate public concerns expressed in Euclid suggests that applying the most rigid compelling state interest test would be improvident when there is available a set of well-developed standards cautiously worked out for balancing these unavoidable and constantly recurring conflicts between the two constitutionally acknowledged interests.[7]
 
 
 60
 Fortunately we are not left to such extreme tests as the only alternatives in adjusting the difficult balance between first amendment protection of worship and the state's interest underlying the validity of zoning ordinances. Through a solid body of precedent, the Supreme Court has developed a standard for reviewing government regulations which infringe on first amendment interests. In those cases the Supreme Court has applied a time, place, and manner test to speech and assembly cases. In my view, cases involving the effect of zoning on religious "exercise" are properly subject to the same analysis.[8] It is not apparent to me how place-of-worship cases can be analytically distinguished from other speech and assembly cases involving time, place, and manner restrictions. Indeed, the Supreme Court has already indicated that regulation of religious speech must be reviewed by applying time, place, and manner restrictions. See Heffron v. International Soc'y for Krishna Consciousness, 452 U.S. 640, 101 S.Ct. 2559, 69 L.Ed.2d 298 (1981). Rather than being cast adrift to engage in decision by ad hoc characterization, reliance on the speech and assembly cases provides a useful standard and procedural framework for determining the proper balance between the interests of the state and of persons seeking to engage in religious speech, assembly, and worship activities.
 
 
 61
 If it is conceded, as I believe it must be, that using buildings as places of worship is not a mere fringe or tangential part of religious exercise but rather central to the congregational worship experience, then it seems much easier to select and apply appropriate standards to the case which is before us.
 
 
 62
 In addition to avoiding the ad hoc characterization problem, application of time, place, and manner restrictions to cases involving zoning laws would result in at least four significant benefits:
 
 
 63
 First, the approach provides a higher level of judicial protection, appropriate to the religious interests involved, than does the due process analysis. The burden of proof is shifted definitively to the government once the initial infringement is recognized. Moreover, there are several steps at which the government may fail to carry its burden: it may fail to demonstrate that the ordinance is a neutral one; it may fail to demonstrate that its interests are sufficiently substantial; or it may fail to demonstrate that its chosen means are least burdensome on protected activity.
 
 
 64
 Second, the least restrictive alternative inquiry, like the due process analysis, provides a flexibility that enables a government to justify its regulation by demonstrating, upon the particular facts of the case, that the ordinance is the least restrictive possible. For example, a municipality may well be able to demonstrate that the construction of a particular church would be unsuitable to a residential area because it would be "basically incompatible with the normal" residential use.
 
 
 65
 The analysis has the third advantage of enabling a court explicitly to recognize the religious interests involved without inquiring into the nature of the religious interests. A court need not decide that an asserted interest is "fundamental," "cardinal," or even not "bizarre" in order to apply the analysis. All it must do is accept the plaintiff's sincere assertion that the activity restricted by a state regulation is religiously motivated. This removes judicial temptation to shop for the appropriate analysis by categorizing the nature of the religious interest involved.
 
 
 66
 Fourth, and perhaps most important, the approach eschews the ad hoc balancing process engaged in by the state courts. While such an approach may sometimes arrive at appropriate results, it does so only inconsistently, and at the price of obscuring the relative weights the court has assigned to competing religious and secular interests.
 
 
 67
 Comment, supra at 1160-61 (footnotes omitted).
 
 
 68
 From the time, place, and manner cases, a four-step analysis may be distilled. The first step is to determine whether the challenged regulation does indeed infringe upon a first amendment interest. Although characterizing the infringement as "indirect," the majority and the defendants have acknowledged that the challenged ordinance at least infringes to some degree on a first amendment interest. As I have previously suggested, the infringement is substantial if not central to notions of "exercise" of religion. See ante at 832. The second step is to determine whether the ordinance is content-neutral. Islamic Center is an example of a case where a zoning ordinance was on its face content-neutral among churches, but as applied discriminated against the Muslim religion. In our case, neither ordinance on its face seem to discriminate among churches, although the 1978 ordinance invites discrimination through its overly discretionary use permit device. The third step is to determine the governmental interest at stake. At least since Euclid in 1926, courts have recognized that the government's interest in zoning is significant, important, or substantial. However, "the presumption of validity that traditionally attends a local government's exercise of its zoning powers carries little, if any, weight where the zoning regulation trenches on rights of expression protected under the First Amendment." Schad, 452 U.S. 61, 77, 101 S.Ct. 2176, 2187, 68 L.Ed.2d 671 (Blackmun, J., concurring). Finally, under this analysis the state must carry the burden in the first instance to prove that the means it has chosen are narrowly tailored to achieve the state's legitimate ends.
 
 
 69
 Because in my view the improper standard was applied, the County never had an opportunity to justify its initial denial of a building permit nor its subsequent denial of the use permit. I do not believe that the 1974 ordinance could facially satisfy the time, place, and manner standard, because its absolute prohibition of churches in the A-2 zone was not narrowly tailored to meet the state's legitimate ends. The limited and inadequate guidelines governing the exercise of discretion in the granting of special use permits also fails to pass constitutional scrutiny. Furthermore, it is doubtful that the reasons actually given by the County for denying the special use permit under the 1978 ordinance were narrowly tailored to minimize infringement on religious exercise. While the very device of a use permit is designed to allow the zoning authorities a means of adjusting particular applications to the site and circumstance, such a device is not intended to grant the authorities unbridled discretion. In the record before us, Jefferson County made no attempt to demonstrate that its denial of the special use permit was narrowly tailored to meet the County's legitimate ends. At least under the amended ordinance, the defendant could not argue that the zone is incompatible with churches under all circumstances. The amended ordinance declares churches acceptable subject only to a use permit. In such cases, as this one is, "it must be narrowly drawn and must further a sufficiently substantial government interest." Schad, 452 U.S. at 68, 101 S.Ct. at 2182.
 
 
 70
 Under the appropriate test, then, the zoning authorities would have the burden of demonstrating that the access and erosion problems cannot be otherwise solved. The County would have to demonstrate that the Church represented a greater erosion hazard than agriculture or, particularly, feed yards in the same zone. But even if the defendant makes this showing, their burden would also require a showing that the erosion hazards could not be ameliorated in the site plan sufficient to satisfy the minimum standards required for other activities permitted as a matter of right in the same zone. The same analysis is true of fire protection. A requirement in the use permit that an automatic sprinkling system be installed comes to mind.
 
 
 71
 Left to its own devices, the first time the trial court considered this case it correctly, in my opinion, "accepted the view that because the denial of a special use permit application precluded the plaintiffs from constructing a facility designed for use in religious worship and related activities, the defendant must demonstrate a government interest of sufficient magnitude to override the interest protected by the free exercise clause." Messiah Baptist Church v. County of Jefferson, 697 F.Supp. 396, 398 (D.Colo.1987). Between that time and the review which resulted in the decision now before us, two decisions of sister circuits, Lakewood, 699 F.2d 303, and Grosz, 721 F.2d 729, intervened. In the absence of guidance from this circuit, the trial court understandably felt it likely that this circuit would follow the characterization of the interest at stake as being merely a secular "building activity". The trial court did not then have the benefit of the more detailed analysis of the interest at stake contained in the Islamic Center an even more recent decision from the Fifth Circuit. Once the trial court felt directed by those intervening circuit decisions to characterize the interest at stake as the mere secular activity of building a building, it reached the only result that such a characterization would permit. Had the court continued in its own original analysis of the interest at stake it undoubtedly would not have granted summary judgment in favor of the defendant zoning authority on the state of the record at that time. The court could not possibly have concluded that as a matter of law the County had satisfied its burden of showing that, facially, the zoning ordinances were narrowly tailored to meet a "sufficiently substantial" government interest or that the alternatives left open were "ample." See Clark v. Community for Creative Non-violence, 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984); Schad, 452 U.S. at 68, 101 S.Ct. at 2182.
 
 
 72
 The trial court was faced with an additional obstacle which this court also must face. The plaintiffs alleged that the statute was invalid on its face and made no attempt to allege that the statute was invalid as applied. If the correct standard is applied to this case, I conclude that the original ordinance that excluded all church uses from the zone, and the amended 1978 version that permitted churches, subject to essentially standardless permit requirements, were in fact invalid on their face. The 1974 ordinance which flatly prohibited the use of buildings in the A-2 zone as houses of worship unconstitutionally violated both the due process clause of the fourteenth amendment and the free exercise clause of the first amendment. A greater showing than is contained on the face of that ordinance is required to carry the state's burden when it is demonstrated that it imposes a significant burden on free exercise. The subsequent 1978 amendment allowing churches to be built only with a special use permit lacked adequate standards to guide the discretion of the zoning officials, thus it too fails to pass constitutional muster.[9] Indeed, by conceding that churches are in general compatible with the zone subject to the special supervision which use permits entail, the defendant is left without the usual justification that churches are simply incompatible with the overall character of the zone. In the parallel free speech cases, where government has used the permit device as a means of regulating time, place, and manner, the Supreme Court has made clear that the grant of the authority to administer the permit system must be accompanied by adequate objective standards reasonably calculated to insure against arbitrariness, capriciousness, or subterfuge. Plain Dealer Publishing Co., --- U.S. ----, 108 S.Ct. 2138, 100 L.Ed.2d 771. While there is room for debate about the amount of specificity and detail required of those standards, there is no statute or regulation in this case providing specificity sufficient to meet even the minimum standards.[10]
 
 
 73
 Therefore, I would hold that these regulations are invalid on their face. Because the case was presented to the trial court under an improper standard, it is premature to consider possible defenses or any of the other issues presented. I would remand the case to the trial court with the guidance herein given. The court may then shape and judge the case fairly, with each party having advance knowledge of the standard and burdens they must meet. If necessary, amendments to the pleadings should be permitted to insure due process.
 
 
 74
 In light of the views expressed herein, I must respectfully dissent from the opinion of the court.
 
 
 
 [1]
 "[W]hen a zoning law infringes upon a protected liberty, it must be narrowly drawn and must further a sufficiently substantial government interest." Schad v. Borough of Mount Ephraim, 452 U.S. 61, 68, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981)
 
 
 [2]
 At least one scholarly piece has synthesized this notion by suggesting:
 Even for religious groups that place less emphasis on ritual, the assembly of a community of believers is an integral part of religion. The periodic reaffirmance of belief in an assembly of fellow believers reinforces the members' commitment to their individual faith. A religious group is more than the sum of its individual believers: the assembly of its members is essential to the creation of a unified community with a shared spiritual life and common goals. The assembly of the members of the church serves not only to create a sense of community among the members themselves through the shared expression of common beliefs, but also to communicate to outsiders the church's identity as a group committed to a common ideal.
 An individual's participation in group worship may serve not only to communicate her views within and without the group, but also as a form of self-expression, important to the inward self. Worship according to a given ritual has a psychological significance for believers, providing them with support and a sense of historical continuity with past participants in the same rituals. The spiritual and aesthetic experience that religious ritual offers contributes to the inner life of many individuals. The sense of community created by group worship is a factor in many persons' sense of self. Moreover, the very decision to be a member of a religious group, and to publicize that decision by attending religious services, may serve as a statement to the world of the way in which the believer chooses to be identified. As one commentator has observed, "freedom to have impact on others--to make the 'statement' implicit in a public identity--is central to any adequate conception of the self."
 Comment, Zoning Ordinances Affecting Churches: A Proposal for Expanded Free Exercise Protection, 132 U.Pa.L.Rev. 1131, 1150-51 (1984) (footnotes omitted).
 
 
 [3]
 Although the parade and protest cases involved speech on public, as opposed to private property, if anything, the Government interest in controlling public property is greater than its interest in controlling private property. At stake in the instance of private property is the individual's interest in speech, assembly, free exercise, property, and the uses to which their own land may be put. The Government has correspondingly less interest (and the individual land owner has greater interest) in regulating private rather than public property. Even in the Eleventh Circuit case of Grosz v. City of Miami Beach, 721 F.2d 729, 740 (1983), cert. denied, 469 U.S. 827, 105 S.Ct. 108, 83 L.Ed.2d 52 (1984), where the constitutionality of a zoning ordinance prohibiting churches was upheld, the court acknowledged that: "Admittedly, restriction of religious conduct on public streets and in airports is less burdensome than restriction of such conduct on an individual's property."
 
 
 [4]
 Clearly, this dispute is not about building activity but rather is about the "uses" to which a building may be put. It is the County's zoning code, not the building code, that prohibits worship without a use permit. If the owners of the lot in question wanted to build a 12,000 square-foot manger in which they intended to shelter a flock of sheep, they could do so as a matter of right. If, on the other hand, the land were owned by a hypothetical church, called the Church of the Nativity, which intended to build the exact same structure, every nail and shingle the same, with the purpose to shelter a flock of worshippers, they could not do so without the unguided dispensation of the planning commission
 
 
 [5]
 See Grosz, 721 F.2d 729; Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. Lakewood, 699 F.2d 303 (6th Cir.), cert. denied, 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983)
 
 
 [6]
 "[W]hen the government intrudes on one of the liberties protected by the Due Process Clause of the Fourteenth Amendment, 'this Court must examine carefully the importance of the governmental interests advanced and the extent to which they are served by the challenged regulation.' " Schad, 452 U.S. at 71, 101 S.Ct. at 2184
 
 
 [7]
 As one scholar has put it:
 A better solution would be to acknowledge that zoning ordinances can affect religious freedom and to subject them to an analysis that explicitly confronts the first amendment interests at stake. Because zoning regulations do not prohibit belief or outlaw behavior that is central to any faith, the government should not have to prove a compelling interest to justify a zoning ordinance. Rather, the analysis appropriate for a neutral government act, like a zoning ordinance, that restricts religious expression should be the same as for neutral government acts that circumscribe secular expression. That analysis, well-established as applied to ordinances regulating the time, place, and manner of a person's speech, requires that the government justify every such regulation by proving not only that it serves an important government purpose, but also that the purpose could not be accomplished by a means less restrictive of expressive freedom.
 Comment, supra, at 1153.
 
 
 [8]
 Although traditional time, place and manner analysis has taken place in the context of cases involving public property, it is not the public/private distinction that is crucial for present purposes, but the nature of the protected activity. It is activity involving speech, assembly, and free exercise which falls under the rubric of first amendment protection
 
 
 [9]
 "[A] law subjecting the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional." Shuttlesworth, 394 U.S. 147 at 150-51, 89 S.Ct. at 938-39
 
 
 [10]
 "[M]unicipalities may regulate expressive activity--even protected activity--pursuant to narrowly drawn content-neutral standards; however, they may not regulate protected activity when the only standard provided is the unbridled discretion of a municipal official." Schad, 452 U.S. at 84, 101 S.Ct. at 2190 (Powell, J., concurring)