Marc **THIRY,** Diane De Fries Thiry, and John D. De Fries Trust, Plaintiffs,

v.

E. Dean **CARLSON,** Kansas Secretary of Transportation, Kansas State Department of Transportation, City of Basehor, Kansas, City of Tonganoxie, Kansas, and County of Leavenworth, Kansas, Defendants,

United States of America, Intervenor.

Civ. A. No. 94–2425–GTV.

United States District Court,
Kansas.

May 8, 1995.

Theodore J. Lickteig, Overland Park, KS, Todd M. Richardson, Leawood, KS, for Marc Thiry, Diane De Fries Thiry, John D. De Fries Trust.

Christina L. Morris, Office of U.S. Atty., Kansas City, MO, for U.S.

Vicky S. Johnson, Office of Chief Counsel, Gelene D. Savage, Kansas Dept. of Transp., John W. Strahan, Topeka, KS, Michael L. Johnston, Kan. Secretary of Transp.

Vicky S. Johnson, Michael B. Rees, Office of Chief Counsel Kansas Dept. of Transp., Topeka, KS, Gelene D. Savage, Michael J. Davis, Stinson, Mag & Fizzell, Kansas City, MO, John W. Strahan, Topeka, KS, for Kansas State Dept. of Transp., City of Basehor, County of Leavenworth, Kan., E. Dean Carlson, Secretary of Transp.

Vicky S. Johnson, Office of Chief Counsel Kansas Dept. of Transp., Topeka, KS, Michael J. Davis, Stinson, Mag & Fizzell, Kansas City, MO, City of Tonganoxie, Kan.

### MEMORANDUM AND ORDER

VAN BEBBER, Chief Judge.

This is an action to enjoin the defendants from condemning certain real estate in Leavenworth County, Kansas, to be used in connection with a highway construction project. The court had previously granted plaintiffs' requests for a temporary restraining order and preliminary injunction. A trial to the court on the merits of the case was then held

on March 20–21, 1995. This Memorandum and Order contains the court's findings of fact and conclusions of law made pursuant to Fed.R.Civ.P. 52(a). For the reasons stated herein, the court finds that plaintiffs are not entitled to the injunctive relief sought. Accordingly, the preliminary injunction will be dissolved and judgment will be entered in favor of defendants.

## I. Background

As part of a highway project, defendant Kansas Department of Transportation (KDOT) offered to purchase a 4.12 acre parcel of land which is part of a larger tract owned by plaintiff John D. De Fries Trust (the Trust) and on which plaintiffs Marc Thiry and Diane De Fries Thiry (the Thirys) reside. The Thirys objected to the project on the grounds that their stillborn baby is buried within the 4.12 acre parcel. The Thirys assert that the gravesite holds spiritual and religious significance for them and is a place of worship and prayer.

In their complaint filed on October 28, 1994, the plaintiffs sought to enjoin defendants from commencing condemnation proceedings and from beginning construction of the highway project. Plaintiffs asserted that KDOT's proposed action violated their rights under the Religious Freedom Restoration Act (RFRA), 42 U.S.C. § 2000bb *et seq.* Plaintiffs also brought their action under 42 U.S.C. § 1983 and claimed that the highway project would violate their rights of free exercise of religion guaranteed by the First Amendment. Plaintiffs' final claim was also brought under § 1983 and alleged that the planned project would deprive the Thirys of their right to family unity and integrity, a liberty interest guaranteed by the Due Process Clause of the Fourteenth Amendment.

The court entered a temporary restraining order on October 28, 1994. After a continuance was granted at defendants' request, the court held a preliminary injunction hearing on December 12–13, 1994. At the conclusion of the hearing, the court granted in part plaintiffs' motion for preliminary injunction and enjoined defendants from taking possession of the property in question and from commencing any construction on the proper-

ty. Defendants were, however, permitted to initiate eminent domain proceedings.

Defendants filed a motion to dismiss plaintiffs' RFRA claim on the grounds that RFRA is unconstitutional. The motion remained under advisement at the time of the trial. Because RFRA's constitutionality was challenged, the United States government was permitted to intervene for the purpose of addressing that issue. Further briefing on the question was deferred, however, until after the trial on the merits of the case. Based on the court's finding that the plaintiffs are not entitled to relief under RFRA, the constitutional question need not be addressed.

A trial to the court was held on March 20 and 21, 1995. The record on which the case was submitted to the court includes the testimony and evidence received at both the trial and the preliminary injunction hearing, pursuant to Fed.R.Civ.P. 65(a)(2). Following are the court's findings of fact and conclusions of law.

## II. Findings of Fact

### A. Parties

1. Plaintiffs Marc and Diane De Fries Thiry, husband and wife, reside in Tonganoxie, Kansas, on property known as Stranger Creek Ranch.

2. Legal title to the property on which the Thirys reside is held by the John D. De Fries Trust. Diane De Fries Thiry is a beneficiary of the Trust.

3. Defendant E. Dean Carlson is Kansas Secretary of Transportation, and is a defendant in this action in his official capacity only.

4. KDOT is an agency of the State of Kansas. The cities of Basehor and Tonganoxie and the County of Leavenworth are all political subdivisions of the State of Kansas.

5. Intervenor United States of America contends that the RFRA, 42 U.S.C. §§ 2000bb *et seq.*, is constitutional, and has intervened in this action for the sole purpose of addressing that issue. The United States took no part in the preliminary injunction hearing or in the trial.

### B. The Property

6. The Thirys reside on a 151–acre tract in Leavenworth County, Kansas, which is owned by the Trust.

7. KDOT has designed highway improvement plans which include constructing a "turnaround", or wider median, on a portion of U.S. Highway 24 which adjoins the property on which the Thirys reside.

8. In order the widen the highway, KDOT has proposed taking a 4–acre parcel of land which is located on the Southeast portion of the property on which the Thirys reside. The Thirys first became aware of this proposed taking in November 1993.

9. Included within this 4–acre parcel is a gravesite where the remains of the Thirys' stillborn baby, Qatlin Soux De Fries Thiry, are buried. The stillbirth occurred on August 28, 1992, the remains were cremated, and the burial took place in March or April, 1993.

10. A large, red quartzite boulder serves as the headstone for the grave. The Thirys later placed a wooden cross about three feet tall at the gravesite.

### C. The Thirys' Religious Beliefs

11. Diane De Fries Thiry is one-thirty-second Delaware Indian. She believes in and practices many tenets of American Indian spirituality which include beliefs in a God as creator, the sanctity of all life, life after death, and the sanctity of gravesites.

12. Diane De Fries Thiry also believes in and practices many tenets of Quakerism and Christianity. These beliefs include baptism by the Holy Spirit rather than by water, peaceable resistance on matters of disagreement, an absence of ritual in worship, a direct relationship with God by an individual without the need for clergy, and sharing of experiences with God in worship services. The Thirys were married in November 1989 at the Stanwood Friends Meeting in McLouth, Kansas, in a Quaker service.

13. Marc Thiry believes in and practices many tenets of Christianity which include observance of a sabbath, or day of rest, the Ten Commandments, God as creator and supreme being, and the existence of sacred places. Marc Thiry also believes in and practices many tenets of American Indian spirituality which include reverence for all things created by God and harmony with other life forms on earth.

14. The area immediately surrounding the red boulder, including the gravesite, is a place which holds special meaning for the Thirys. Diane De Fries Thiry has gone to that area to pray since she was seven years old. The area was also a place of prayer for Marc Thiry prior to his marriage to Diane. The Thirys practice their religious beliefs by visiting the area to be near the spirit of their deceased child and to worship and pray. The Thirys plan to be buried alongside the grave of their child.

15. The Thirys believe that their religious beliefs and practices will continue even if KDOT is allowed to proceed with its condemnation action and construction of the planned highway improvements. The Thirys have in the past prayed, worshiped, and felt a closeness with God at places other than the area around the red boulder.

16. The Thirys have maintained a closeness with the spirit of their daughter continuously since her death, even during the six to seven months before her burial.

17. Christian beliefs in the sanctity of burial sites are not violated by moving gravesites when necessary, and moving the gravesite would not be inconsistent with tenets of American Indian spirituality if the Thirys believed it to be necessary. Although a site for prayer and worship is important to Quakers, a basic tenet of Quakerism is that God is within individuals and one particular location is no more or less sacred than another. Despite their beliefs in the sanctity of burial sites, the Thirys would agree to move their child's grave if they believed that it was required in order to build a safe highway.

### D. The Highway Project

18. The highway project at issue in this case is part of a state-wide program to upgrade safety on Kansas highways and promote economic development. The program

was enacted by the Kansas Legislature in 1989.

19. The project includes improving U.S. Highway 24 between Tonganoxie and Basehor by constructing a four-lane limited access highway in place of the current two-lane highway. Approximately $30 million has been invested in this project.

20. On November 18, 1991, the cities of Basehor and Tonganoxie and the County of Leavenworth entered into an agreement with then Kansas Secretary of Transportation, Michael L. Johnston, related to the highway project. Under the agreement, the Secretary completes the project on behalf of the local governments and acts as their agent in all matters related to the project.

21. Currently, U.S. Highway 24 between Tonganoxie and Basehor is a two-lane, two-way highway. At the time it was constructed, provisions were made to eventually add two lanes on the north side of the highway, and rights of way were acquired for that purpose. When the project to improve the highway was undertaken, the initial design used the existing right of way and provided for a narrow median. In order to provide greater access for local landowners, KDOT modified the initial design to provide for turnaround areas through the median which would allow vehicles to make left turns and U-turns. Because of the presence of farm equipment, horse trailers, and semi trucks, the decision was made to widen the median at those turnaround points to 150 feet. The widened medians are necessary for public safety.

22. Under the modified design, three 150-foot medians are planned along the portion of the highway between Basehor and Tonganoxie. These turnarounds are spaced approximately two miles apart which KDOT engineers believe to be the maximum distance that drivers are willing to travel to reach a turnaround. One of those 150-foot medians is planned at the intersection of 198th Street. This widened median will require additional right of way which KDOT proposes to acquire from the Thiry property on the north side of the highway.

23. The 150-foot wide medians are desirable because they allow multiple vehicles to use the median simultaneously while waiting to complete their turns. In addition, semi-trailer trucks, buses, and other truck-trailer combinations are able to fully fit within the median while waiting to turn. This makes it less likely that vehicles waiting to turn will block traffic lanes or will block access from the median to vehicles turning in the opposite direction. Finally, the wider median makes it possible for larger vehicles to safely complete U-turns.

24. After receiving objections from the Thirys, KDOT considered alternatives to the planned placement of the 150-foot median. One alternative was to construct a 90-foot median. The narrower median would result in cost savings of $300–400,000.00. The primary disadvantage to the 90-foot median is that it provides less storage for turning vehicles. In addition, it is not clear from the record how much additional right of way would be needed for a 90-foot median and whether the gravesite would be affected.

25. The second alternative was to acquire the additional right of way from property owners on the south side of the highway. KDOT rejected this option because it would affect eight landowners rather than just one, and because the residences on the south side were located fairly close to the highway. This option would result in a cost savings of approximately $50,000.00.

26. The final alternative that KDOT considered was to move the turnaround approximately one mile west. The primary disadvantage to this alternative is that the two-mile spacing would be disrupted and some drivers would be forced to travel a longer distance. In addition, this alternative would increase costs by about $700,000.00.

### III. Conclusions of Law

#### A. RFRA Claim

█ Under RFRA, the government "may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental

interest." 42 U.S.C. § 2000bb–1(b). In applying this strict scrutiny test courts are to look to Free Exercise Clause decisions of the Supreme Court prior to its decision in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). 42 U.S.C. § 2000bb(a). RFRA defines a statutory, if not constitutional, right to the free exercise of religion which incorporates the compelling interest test set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). *See Werner v. McCotter,* 49 F.3d 1476 (10th Cir., 1995); 42 U.S.C. § 2000bb(b)(1).

■ In *Werner,* the Tenth Circuit held that in order to state a prima facie claim under RFRA, a plaintiff must make the same two threshold showings as required under *Yoder* for free exercise claims. *See Werner,* 49 F.3d at 1479–80 n. 1. First, the governmental action must burden a religious belief rather than a philosophy or a way of life. *Yoder,* 406 U.S. at 215–19, 92 S.Ct. at 1533–35. Second, the plaintiff's belief must be sincerely held. *Id.* In this case, the court finds the Thirys' testimony regarding their beliefs to be credible, and concludes that the beliefs that would be burdened by KDOT's actions are religious in nature and sincerely held by the Thirys.

Having made these threshold showings, plaintiffs have the burden of proving that the governmental action would substantially burden the exercise of their religion. *Werner,* 49 F.3d at 1480 n. 2 (citing *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995)). The burden then shifts to the government to demonstrate that the challenged action furthers a compelling state interest in the least restrictive manner. 42 U.S.C. § 2000bb–1(b).

■ While RFRA indicates that its prohibition extends only to governmental actions that "substantially burden" the exercise of religion, it fails to define either the term "burden" or its modifier "substantially." Instead, Congress apparently intended courts to look to existing case law to construe the phrase. *See* S.Rep. No. 111, 103d Cong. 1st Sess. 8 (1993), *reprinted in* 1993 U.S.C.C.A.N. 1892, 1898 ("The committee ex-

pects that the courts will look to free exercise cases decided prior to *Smith* for guidance in determining whether the exercise of religion has been substantially burdened.").

In *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), a Seventh Day Adventist who observed a Saturday Sabbath lost her job when she refused to work on Saturdays. *Id.* at 399, 83 S.Ct. at 1791. A state agency then denied her unemployment benefits because it found that she had failed to accept suitable work when it was offered. *Id.* at 400–01, 83 S.Ct. at 1791–92. In holding for the claimant, the Court found that the state had placed a burden on her free exercise of religion.

> [T]he pressure upon her to forego [religious] practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand. Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against an appellant for her Saturday worship.

*Id.* at 404, 83 S.Ct. at 1794. Not every burden imposed by government, however, is substantial enough to force the government to prove that its action is taken in furtherance of a compelling government interest and in the least restrictive manner. In *Lyng v. Northwest Indian Cemetery Protective Ass'n,* 485 U.S. 439, 450–51, 108 S.Ct. 1319, 1326–27, 99 L.Ed.2d 534 (1988), the Court held that the incidental effects of otherwise lawful government programs "which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute substantial burdens on the exercise of religion.

In *Lyng,* the Court found no substantial burden on Native Americans who objected to the construction of a timber road through a traditional religious site which was located on federal land. The Court reached this conclusion even though it assumed that "the threat to the efficacy of at least some religious

practices is extremely grave." 485 U.S. at 451, 108 S.Ct. at 1326. Evidence in the case included a study which concluded that the proposed road "would cause serious and irreparable damage to the sacred areas which are an integral and necessary part of the belief systems and lifeway of Northwest California Indian peoples." *Id.* at 442, 108 S.Ct. at 1322 (quoting study). The Court nevertheless found that burdens on free exercise could not result from acts of government which neither "coerced" individuals "into violating their religious beliefs" nor denied them "an equal share of the rights, benefits, and privileges enjoyed by other citizens." *Id.* at 449, 108 S.Ct. at 1325.

In this case, taking the Thirys' land as proposed by the state would undoubtedly impose a burden on practices related to the Thirys' religious beliefs. That burden, however, is not so substantial as to give rise to a claim under RFRA. The gravesite and the area immediately surrounding it is a place which holds special meaning for the Thirys. They practice their religious beliefs by visiting the area to be near the spirit of their deceased child and to worship and pray. The Thirys testified, however, that their religious beliefs and practices will continue even if the planned highway is constructed. They also acknowledged that they have prayed and worshipped at other locations. Finally, while the Thirys profess a belief in the sanctity of burial sites, they have pointed to no religious belief or tenet that would forbid in all situations the moving of a gravesite. Under the standard set forth by the Supreme Court in *Lyng,* this court concludes that the action proposed by KDOT in this case would not impose a substantial burden on the Thirys exercise of their religion.

Plaintiffs contend that the facts in *Lyng* can be distinguished from the facts in this case in that the controversy in *Lyng* involved the use of land already owned by the federal government, and not the taking of privately owned land. This distinction is of some importance. The *Lyng* Court noted that "[w]hatever rights the Indians may have to use of the area, however, those rights do not divest the Government of its right to use what is, after all, *its* land." 485 U.S. at 453,

108 S.Ct. at 1327. Further, the *Lyng* opinion specifically adopted the reasoning of an earlier case which stands for the proposition that the government need not establish a compelling interest when its action involves only management of internal government affairs. *See id.* at 448–49, 108 S.Ct. at 1324–26 (discussing *Bowen v. Roy,* 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986) which rejected a claim that a federal statute requiring the use of Social Security numbers in administering certain welfare programs was subject to strict scrutiny when challenged by welfare applicants who claimed that use of a numerical identifier for their daughter would violate their religious beliefs).

After reviewing the *Lyng* opinion, however, this court concludes that the outcome was not based on the fact that the property at issue was owned by the government. Instead, the Court focused much of its discussion on the nature of the government action and the effects that action would have on the individuals' religious beliefs and practices. In a similar case, the Tenth Circuit held that ownership of the property in question was not determinative in a free exercise claim. *See Badoni v. Higginson,* 638 F.2d 172, 176 (10th Cir.1980), *cert. denied,* 452 U.S. 954, 101 S.Ct. 3099, 69 L.Ed.2d 965 (1981). In *Badoni,* the Tenth Circuit held that the government must manage its property in a manner consistent with the Constitution and that courts must look to the government's action and the plaintiff's position to determine whether a free exercise claim is stated. *Id.* (citing *Sequoyah v. Tennessee Valley Auth.,* 620 F.2d 1159, 1164 (6th Cir.), *cert. denied,* 449 U.S. 953, 101 S.Ct. 357, 66 L.Ed.2d 216 (1980); *Wisconsin v. Yoder,* 406 U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972)). Finally, a number of courts have upheld zoning regulations which imposed restrictions on privately owned church property. *See Messiah Baptist Church v. County of Jefferson,* 859 F.2d 820, 823–26 (10th Cir. 1988) (zoning ordinance which precluded church from building in agricultural zone imposed no impermissible burden on religion), *cert. denied,* 490 U.S. 1005, 109 S.Ct. 1638, 104 L.Ed.2d 154 (1989); *Rector, Wardens, and Members of Vestry of St. Bartholomew's Church v. City of New York,* 914 F.2d 348,

353–55 (2d Cir.1990) (holding that Landmarks Preservation Law imposed no unconstitutional burden on free exercise of religion), *cert. denied,* 499 U.S. 905, 111 S.Ct. 1103, 113 L.Ed.2d 214 (1991); *Lakewood Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood, Ohio,* 699 F.2d 303, 307–08 (6th Cir.) (holding that zoning ordinance which prohibited church buildings in certain area did not infringe on religious freedom), *cert. denied,* 464 U.S. 815, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).

The court concludes that plaintiffs have not established that the defendants' proposed action would substantially burden the Thirys' exercise of their religion. As a result, it is not necessary to determine whether the proposed action is in furtherance of a compelling government interest and whether it is the least restrictive means of furthering that interest. Because the court has concluded that plaintiffs do not state a claim for relief under RFRA, it is also unnecessary to address defendants' claim that the statute is unconstitutional. *See American Foreign Service Ass'n v. Garfinkel,* 490 U.S. 153, 161, 109 S.Ct. ·1693, 1697–98, 104 L.Ed.2d 139 (1989) (Especially in cases implicating a fundamental relationship between branches of government, "courts should be extremely careful not to issue unnecessary constitutional rulings.").

B. First Amendment Claim

■ Plaintiffs second claim, brought pursuant to 42 U.S.C. § 1983, alleges that defendants' proposed action violates plaintiff's right of free exercise of religion under the First and Fourteenth Amendments. In bringing this claim, plaintiffs contend that defendants' proposed action violates current Supreme Court standards for free exercise claims as articulated in *Employment Division v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990).

The *Smith* Court held that "the right of free exercise does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Smith,* 494 U.S. at 879,

110 S.Ct. at 1600. If the law is "generally applicable," the government need not show that it serves an important (let alone compelling) purpose, even if its effect substantially burdens the practice of religion. *Id.* at 885, 110 S.Ct. at 1603–04.

In this case, plaintiffs have failed to show that the laws under which the state derives its authority to take the proposed action—laws granting condemnation authority—are anything but neutral laws of general applicability. There is no evidence whatsoever that the relevant laws are in any way intended to target religious activity. *Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* — U.S. ——, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (striking down city ordinance restricting ritual slaughter of animals on grounds that ordinance specifically targeted religious practice and failed to meet strict scrutiny standard).

The *Smith* Court also noted that earlier cases had applied the compelling interest test when the government regulation at issue burdened a separate constitutional right in addition to free exercise. *See id.* at 881–82, 110 S.Ct. at 1601–02. Plaintiffs argue that defendants' proposed action interferes with their substantive due process right to family unity and integrity, along with their free exercise right. However, analysis of this claim reveals that it is not valid and that the "hybrid rights" exception does not apply here. As explained below, plaintiffs have presented no evidence to support their substantive due process claim. As a result, there is no basis for applying the compelling interest test to defendants' actions under the principles set forth in *Smith.*

The court concludes that plaintiffs have failed to establish any violation of their rights guaranteed by the Free Exercise Clause of the First Amendment.

C. **Due Process Claim**

■ Plaintiffs' final claim is also brought pursuant to 42 U.S.C. § 1983 and alleges that defendants' project·would deprive plaintiffs of their right to family unity and integrity, a substantive due process right guaranteed by the Fourteenth Amendment. "The

protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver,* —— U.S. ——, ——, 114 S.Ct. 807, 812, 127 L.Ed.2d 114 (1994). Supreme Court precedent has " 'respected the private realm of family life in which the state cannot enter.' These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2807, 120 L.Ed.2d 674 (1992) (quoting *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944)).

Assuming that the rights encompassed by the protections of substantive due process include a right to family unity, the court finds that plaintiffs have failed to present evidence that defendants' proposed actions will infringe on that right. The court accepts the Thirys' assertion that they wish to be buried alongside the grave of their daughter, but nothing that the defendants propose would preclude that. The court is simply unable to discern any basis for the claim that defendants' actions will interfere with the Thirys' family unity.

### IV. Conclusion

While the court is fully aware that the taking of this land for a highway project will be disruptive and traumatic for the Thirys, there is simply no recourse under federal statutes or the Constitution. While RFRA imposes important restrictions on governmental actions that affect religion, it does so only for those actions which substantially burden one's exercise of religion. Under the facts presented in this case, the court concludes that the government's action will not substantially burden the Thirys' religious beliefs and practices.

Rights guaranteed under the Free Exercise Clause of the First Amendment, independent of RFRA, generally do not serve to restrict governmental actions that are based on valid and neutral laws of general applica-

bility, as are the proposed actions in this case.

Finally, plaintiffs have failed to establish that the proposed action will in any way impair rights related to family unity guaranteed by the Due Process Clause of the Fourteenth Amendment.

IT IS, THEREFORE, BY THE COURT ORDERED that the preliminary injunction entered on December 14, 1994, is dissolved.

IT IS FURTHER ORDERED that the clerk of the court shall enter judgment in favor of the defendants.

Copies of this order shall be mailed to counsel of record for the parties.

**IT IS SO ORDERED.**