**COTTONWOOD CHRISTIAN CENTER, Plaintiff,**

v.

**CYPRESS REDEVELOPMENT AGENCY; City of Cypress; Does 1–10., Defendants.**

**No. SA CV 02–60 DOC (ANx).**

United States District Court, C.D. California.

Aug. 6, 2002.

---

Sean P. O'Connor, Andrew J. Guilford, Jeffrey Michael Blank, Sheppard Mullin Richter & Hampton, Costa Mesa, CA, Kevin J. Hasson, Roman Storzer, Anthony R. Picarello, Jr., Washington, DC, for plaintiff.

Dan Slater, Michael D. Rubin, Jeffrey T. Melching, John A. Ramirez, Karen Lynn Martinez, Rutan & Tucker, Costa Mesa, CA, William W. Wynder, Anthony R. Taylor, Burke, Williams & Sorensen, Irvine, CA, for defendants.

## *ORDER* DENYING DEFENDANTS' MOTION TO DISMISS AND GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

CARTER, District Judge.

Before the Court are Defendants City of Cypress and Cypress Redevelopment Agency's motion to dismiss and Plaintiff Cottonwood Christian Center's motion for a preliminary injunction. After reviewing the moving, opposing, and replying papers, and for the reasons set forth below, the Court DENIES Cypress's motion to dismiss and GRANTS Cottonwood's motion for a preliminary injunction.

### I.

### BACKGROUND

This case is a dispute between the City of Cypress (Cypress or City) and the Cottonwood Christian Center (Cottonwood) over an 18 acre parcel of property located at the corner of Katella Avenue and Walker Avenue in Cypress, California (the Cottonwood Property). In sum, Cottonwood, the owner of the Cottonwood Property, seeks to build a church facility which would include a 4,700 seat auditorium and surrounding buildings for use in its ministries. After failing to get the appropriate land use permits from the City, Cottonwood brought this action. Cypress, on the other hand, wants the Cottonwood Property to be used as commercial retail space, with the plan to place a major discount retailer such as Costco on the Cottonwood Property. To this end, the City has begun eminent domain proceedings on the Cottonwood Property. Cottonwood seeks to preliminarily enjoin those proceedings.

### A. City of Cypress

Cypress is a charter city located in Northwestern Orange County, California. Cypress was incorporated in 1956 and was originally named Dairy City. At the time of its incorporation, Cypress consisted of mostly ranch houses and dairy farms. In the half-century since its founding, Cypress has grown from a population of less than 1,000 people to a population of approximately 48,000. Cypress covers 4,257 acres and includes approximately 16,125 residences, 1,200 commercial businesses, a community college, and an assortment of parks, schools, service organizations, and churches. Although the dairy farms have largely faded away, Cypress remains predominately a bedroom community.

Cypress is governed by a five-member City Council in a "council-manager" form of government. In April 1979, the Cypress City Council adopted Ordinance No. 639 which created the Cypress Redevelop-

ment Agency (Redevelopment Agency) pursuant to Cal. Health & Safety Code § 33101. The Redevelopment Agency was created in order to redevelop various blighted areas within Cypress. The Redevelopment Agency is governed by a five-member Board of Directors. Pursuant to statute, the Board of Directors of the Redevelopment Agency consists of the members of the Cypress City Council.

## B. Los Alamitos Race Track Redevelopment Project

Near the center of the City are two of Cypress's major businesses-the Los Alamitos Race Track and the Cypress Golf Club. Those properties are within what is now the Los Alamitos Race Track and Golf Course Redevelopment Project (LART Plan) Area. The LART Plan Area consists of nearly 300 acres bounded by Katella Avenue on the South, Walker Street on the East, Cerritos Avenue on the North and Lexington Drive on the West. The Cottonwood Property is located in this area, along the corner of Katella Avenue and Walker Avenue. By 1987, this entire property was zoned PS (Public/Semi–Public). Among other uses, churches are permitted provided they receive a Conditional Use Permit (CUP).

In 1984, Hollywood Park Realty Enterprises, Inc. (Hollywood Park) purchased the LART Plan Area property, including the race track and the golf course. In 1987, it began formulating proposals to redevelop the land into a business park. In response to proposals to close the golf course and turn 224 acres of this land into commercial or industrial uses, voters in Cypress adopted "Measure D" at a special

election in November 1987. Measure D was an initiative which prohibited the City Council from changing the designation of any land zoned PS or allowing any land use not then permitted under the PS zoning. Thus, the City Council could not change the land uses in the LART Plan Area without approval of the voters.

In 1988, a new project called Cypress Downs was proposed for the area. Although it included less commercial space then the 1987 proposals, it left only 30 of the 300 acres zoned PS. Pursuant to Measure D, the plan was put before the voters, who rejected it.

Sometime prior to 1990, the entire LART Plan Area, including the golf course and the race track, were sold to Cypress Development Partnership (CDP). In 1990, CDP sought to have 75 acres of its property, including the current Cottonwood Property, re-designated as PB25A (Planned Business Park of 25 acres or more). This re-designation would allow additional land uses beyond those allowed in a PS zone, but would still allow churches with a CUP. Consistent with the provisions of Measure D, the proposal was submitted to the voters as the Cypress Business and Professional Center Initiative (CBPCI) at a special election on April 24, 1990. The voters approved CBPCI and the property was rezoned. Sometime thereafter, the ownership of the land was broken up, and individual entities came into ownership of various parcels of the property.

Also in April 1990, the Cypress City Council adopted the Cypress Business and Professional Center Specific Plan (Specific Plan).[1] The Specific Plan is a "a planning tool that implements the physical and eco-

---

**1.** The Specific Plan was adopted one week before the voters approved CBPCI. Presum-

ably, the Specific Plan was contingent upon adoption of the CBPCI, as it includes the land

nomic development of the project area." (Belmer Decl. Ex. G at 180, Specific Plan at III–1.) The Specific Plan's goals are "[t]o achieve the best possible land use for the Specific Plan area with emphasis on employment generation, economic growth, and generation of revenue, while retaining the golf course and race track uses on site." (*Id.* at III–2). Under the Specific Plan, the types of uses allowed are "a wide range of uses in the development area that achieve compatibility, reflect the needs of the community and are marketable." (*Id.*) The Specific Plan designated the area of the Cottonwood Property as "Professional Office," which includes churches as permitted with a CUP.

Shortly after the passage of CBPCI, the City Council adopted Ordinance No. 851 on June 18, 1990, which created the Los Alamitos Race Track and Golf Course Redevelopment Project (LART Plan). Adoption of the LART Plan put the land under the jurisdiction of the Redevelopment Agency. As a necessary condition for adopting the LART Plan Area, the City determined that the LART Plan Area was blighted.

In addition to placing the area under the jurisdiction of the Redevelopment Agency, the City adopted the LART Plan which set forth seven general goals including elimination of environmental deficiencies, comprehensive planning, stimulating growth and development. Additionally, the LART Plan includes 17 specific proposed plans for action including exercise of eminent domain, redevelopment, provision of open space, encouraging public and private improvements, providing replacement housing, open spaces, installation of streets and sidewalks and addressing financial burdens.

Despite having approved a re-zoning, the Specific Plan, and a redevelopment plan, the LART Plan Area remains largely underdeveloped. After ten years of being within a redevelopment zone, less than 10 percent of the land set aside for a business park in the Specific Plan has been developed. It is one of the largest areas of underdeveloped real property in Orange County. Most of the LART Plan remains zoned PS for public and semi-public uses. The 75 acres zoned PB25A are located primarily along Katella Avenue on the Eastern side of the LART Plan Area along Walker Street. Katella Avenue is a major arterial street and is designated by the Orange County Transportation Authority as a "smart street." Walker Avenue is a major "collector street." Accordingly, Cypress describes the Cottonwood Property as a "gateway property." According to the City, the way that the Cottonwood Property is developed will determine how the rest of the undeveloped property in the LART Plan Area is developed. The Cottonwood Property, however, has remained essentially vacant for the last 12 years.

## C. Cottonwood Christian Center

Cottonwood is a non-denominational Christian church with its current worship facilities located in Los Alamitos, California, adjacent to Cypress. Cottonwood has grown remarkably over the last twenty years, from approximately 50 adult members when it was founded in 1983 to its current membership of over 4,000 adults and 1,200 children and youth. Cottonwood's popularity is not limited to the

re-zoned under the CBPCI. Essentially, the two measures were companion planning

pieces.

immediate vicinity. Cottonwood conducts a television ministry where its services are broadcast on television. Additionally, Cottonwood hosts numerous national conferences each year, drawing visitors from among the several states.

As a result of its fantastic expansion, Cottonwood has outgrown its Los Alamitos site which can only accommodate 700 attendees at one time. In order to deal with its growing membership, Cottonwood holds six worship services each weekend, four on Sunday and two on Saturday. Because of insufficient parking on site, Cottonwood has instituted a "shuttle ministry," whereby it transports attendees from off-site parking lots to its church facility. Even with the Shuttle Ministry and multiple weekend services, Cottonwood is unable to accommodate all the people that want to attend its services and it is unable to conduct outreach to potential new members. The physical constraints of its current facility also limit Cottonwood's ability to conduct many of its different programs from youth conferences, women's ministries, daycare facilities, English language classes for native Spanish speakers, and missionary training.

### 1. Cottonwood's Religious Beliefs

Cottonwood is guided by its vision of "bringing a living Jesus to a dying world." According to Cottonwood's Senior Pastor, Bayless Conley, Cottonwood believes that

the teachings of Jesus require [Cottonwood members] to make a lasting impact in the Orange and Los Angeles County communities [it] serve[s] (as well as throughout Southern California and the world) by ministering to the spiritual and physical needs of the members of these communities. [Cottonwood members] are therefore compelled to contin-

ually seek growth in the size of [their] congregation and [their] ministries.

Cottonwood's present facility severely restricts Cottonwood's ability to fulfill its missions. Additionally, the multiple services require Cottonwood's ministers to cut short their sermons because of the need to accommodate multiple weekend services. The shortcomings of its current facilities also conflict with one of the church's philosophies as to the nature of worship. As Pastor Conley explains, Cottonwood members

believe that the Bible teaches all individual Christians to join a church. Cottonwood is a collection of individual Christian believers who together form one body-the church-that is the bride of Christ. Because the church is one body, it is essential to our faith that the whole church body regularly assemble together as a body to worship God, to carry out God's divine ordinances, such as communion and baptism, and to fellowship with one another so that one part of the body can serve the needs of another part of the body.

### 2. New Facility for Cottonwood

Because of its growing membership and religious needs, Cottonwood began searching for a new facility in 1994. Cottonwood determined that it needed a facility large enough for its present and future ministries. It sought a location in the northwestern part of Orange County because a large number of its members are in Cypress and Los Alamitos. In 1998, Cottonwood targeted six individual parcels of land in the LART Plan Area. These six parcels were owned by four different entities. Cottonwood spent a year acquiring the different parcels until it had assembled the current 18 acre Cottonwood Property

site. Cottonwood's efforts culminated with two different land-sale contracts that closed escrow in September 1999.

Cottonwood developed detailed plans to use its newly acquired property. Its proposed church center would contain a 300,-000 square foot worship center with more than 4,700 fixed seats, multiple classrooms and a multi-purpose room for youth and other ministries. The proposed center would also have a youth activity center, gymnasium, and study rooms for after school youth programs. The facility would also include a 200 child daycare facility for church members and the surrounding community and a religious bookstore. The proposed center would have sufficient space for all of Cottonwood's current ministries, community service programs, and worship services.

## D. Church's Efforts to Obtain Zoning Approval

During the year that Cottonwood was assembling and planning its development of the Cottonwood Property, Cottonwood contacted Cypress officials about the proposed Cottonwood development. On June 2, 1999, Cottonwood representatives met with City planning officials to discuss the proposed plan. According to a June 4, 1999 follow-up letter sent by Alice Angus, then Cypress Community Development Director, churches were indeed permitted uses on the Cottonwood Property. Staff, however, took the position that it was "unlikely that a church would be found consistent with the goals and objectives of the Redevelopment Plan and/or Specific Plan."[2]

Cottonwood completed assembly and purchase of the Cottonwood Property in

September 1999. After making numerous studies and plans, Cottonwood submitted a CUP application to the City on October 6, 2000. On October 26, 2000, the City Planning Manager informed Cottonwood that the CUP application was incomplete because it did not contain design review studies that the City staff desired.

The administrative rejection of the CUP application was significant because while Cottonwood was making plans and seeking approvals to build a church on its property, the City had other designs for the land. In August 2000, City staff proposed a new usage of much of the LART Plan Area property on Katella and Walker Avenues. Apparently having determined that the Business Park plan was not working out, staff created a plan for a "Town Center" on approximately 35 to 45 acres of the LART Plan Area, including the Cottonwood Property. The Town Center would have two or three major retail anchor stores and include a mix of restaurants, smaller retail stores, and movie theaters, to create a center similar to the Irvine Spectrum or The Block in Orange. In order to allow the staff to explore this development plan, the City Council adopted a moratorium on discretionary land use permits on October 30, 2000. The moratorium prevented the granting of any discretionary land use permits, including CUPs, that were not complete prior to October 30, 2000. The original moratorium was for a 45 day period but was extended for ten months and 15 days and again for an additional 12 months to October 30, 2002.

Because the City Planning Manager had determined that Cottonwood's application

2. There is no indication why the City staff believed that a church would be incompatible with the LART Plans and Specific Plan goals of "achiev[ing] the best possible land use for the Specific Plan area" and "eliminating blight."

was incomplete, its application for a CUP could not even be considered by the City. Cottonwood was therefore effectively prevented from obtaining a CUP. Accordingly, it appealed the City Planning Manager's decision to the City Council.

While Cottonwood's appeal was pending, City staff explored the Town Center Plan and solicited from property-owners whether they were interested in participating in the Town Center plan. City staff sent a letter to Cottonwood to determine its interest in participating in the project.

Apparently, the Town Center Project did not turn out to be feasible. In late 2001, City staff determined to develop a scaled down project with one or two major retail anchors and a small number of retail shops or restaurants (not dissimilar from a strip mall). This project was labeled the "Walker/Katella Retail Project." Instead of the 35 to 45 acres of the Town Center Project, the City's Walker/Katella Retail Project planned to use only 18 acres. The only land included in the Walker/Katella Retail Project is the Cottonwood Property.

The most notable proposal for the Walker/Katella Retail Project is from Costco, a major warehouse style discount retail outlet. Costco has proposed building a 150,-000 square foot Costco store on the land, complete with a tire service center and food service component. The development would also include two 7,000 square-foot free-standing restaurants.

Again, the City sent Cottonwood a letter seeking a statement of whether Cottonwood was interested in participating in the new Walker/Katella Retail Project. Cot-

tonwood responded by indicating that it was interested in developing the land, as a church.

Finally, on February 11, 2002, the City Council considered Cottonwood's appeal. The City Council recognized that the City Planning Manager's decision had been in error and that, in fact, design review studies were not required before a CUP was granted. The City Council deemed the CUP application complete and directed City staff to undertake its review. In turn, City staff has since requested that Cottonwood make a $10,000 deposit for City staff to pay for environmental experts to undertake an environmental review.

## E. Cypress's Exercise of Eminent Domain

On February 28, 2002, the Redevelopment Agency made an offer to purchase the Cottonwood Property for $14,583,500. Cottonwood refused.

On April 8, 2002, the Redevelopment Agency determined that Cottonwood's statement of interest in participation was non-responsive. It further determined that, even if it were responsive, a third-party statement of interest from Costco was more consistent with the City's plans.[3] The Redevelopment Agency then determined to take steps to acquire the land.

On May 28, 2002, the City Council adopted a Resolution of Conformity, declaring that the proposed Walker/Katella Retail Project conformed to the City's General Plan and the Specific Plan. That same day, the Redevelopment Agency adopted a Resolution of Necessity, deter-

3. This is self-evident, given that the plan for the Walker/Katella Retail Project was to place a Costco on the site. Needless to say, the Walker/Katella Retail Project is far different

from the Business Park plan that the City had devised when it adopted the LART Plan and the Specific Plan in 1990.

mining that it was necessary for the Redevelopment Agency to acquire the land and directing counsel to file an eminent domain action. The City filed an action in state court to condemn the land on May 29, 2002.

## F. Current Lawsuit

Cottonwood had filed this action on January 15, 2002, challenging various land use decisions by the City and the Redevelopment Agency as violating the United States and California Constitutions and various state statutes. Cottonwood simultaneously filed an identical state court action, which the City removed to this Court and consolidated into this action. On June 28, 2002, Cottonwood filed an Amended Complaint and seeking to preliminarily enjoin the City's condemnation actions. The City filed a motion to dismiss certain claims based on improper service by publication.

## II.

## MOTION TO DISMISS

### A. Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a complaint can be dismissed when a plaintiff's allegations fail to state a claim upon which relief can be granted. The Court must construe the complaint liberally, and dismissal should not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957); *see Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir.1988)

(stating that a complaint should be dismissed only when it lacks a "cognizable legal theory" or sufficient facts to support a cognizable legal theory). The Court must accept as true all factual allegations in the complaint and must draw all reasonable inferences from those allegations, construing the complaint in the light most favorable to the plaintiff. *Westlands Water Dist. v. Firebaugh Canal,* 10 F.3d 667, 670 (9th Cir.1993); *Balistreri,* 901 F.2d at 699; *NL Indus., Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Dismissal without leave to amend is appropriate only when the Court is satisfied that the deficiencies of the complaint could not possibly be cured by amendment. *Chang v. Chen,* 80 F.3d 1293, 1296 (9th Cir.1996); *Noll v. Carlson,* 809 F.2d 1446, 1448 (9th Cir. 1987).

### B. Discussion

Defendants seek to dismiss Counts 16 through 21 of Cottonwood's complaint, which seek review under writs of mandate for various zoning decisions,[4] due to technical violations of the Validation Statutes, Cal.Civ.Proc.Code § 863. Pursuant to the Validation Statutes under which Cottonwood seeks relief:

If the interested person [here Cottonwood] bringing such action fails to complete the publication and such other notice as may be prescribed by the court in accordance with Section 861 and to file proof thereof in the action within 60 days from the filing of his complaint, the action shall be forthwith dismissed on the motion of the public agency unless good cause for such failure is shown by the interested person.

Cal.Civ.Proc.Code § 863

Here, Cottonwood filed the case on January 15, 2002. Thus, Cottonwood was

4. These counts are essentially identical in the Amended Complaint.

required to file the proof of publication under the Validation Statute by March 18, 2002. Cottonwood did not complete the filing of proof of service until April 16, 2002. Defendants make much of this 29 day delay, but Cottonwood is excused for good cause shown.

"The concept of good cause should not be enshrined · in legal formalism; it calls for a factual exposition of a reasonable ground for the sought order." *Waters v. Superior Court,* 58 Cal.2d 885, 27 Cal. Rptr. 153, 157, 377 P.2d 265 (1962). "Good cause" must include reasonable diligence that does not cause "abuse of the inherent rights of the adversary." *Id.* at 158, 377 P.2d 265 (quoting *Greyhound Corp. v. Superior Court,* 56 Cal.2d 355, 15 Cal.Rptr. 90, 364 P.2d 266 (1961)).

There is no argument by the City that the service was insufficient or that it did not allow sufficient time for members of the community to respond to it (although none have). Nor do Defendants contend that they have been prejudiced by not knowing whether the publication was complete. Cottonwood, on the other hand, shows good cause to be excused for the minor delay.

Cottonwood first sought an order for publication on February 19, 2002.[5] The Court did not grant that request for more than a week, as it researched the service by publication requirements, not generally used in federal court. Furthermore, service was delayed because Cottonwood, seeking to insure its rights, filed suit in both state and federal court. On February 13, 2002, Defendants removed the state case to federal court. Cottonwood

was therefore unsure of the proper notice to give, since sending notice that answers should be filed in state court would be moot if the case were transferred here. Certainly, the state legislature in writing the Validation Statute did not take into account those cases where a writ of mandate action is removed to federal court.

Cottonwood had the *Orange County Register,* an appropriate newspaper for service by publication, publish the notice on the earliest date following the Court's order. Unfortunately, the delay from the Court and the delay in lead time for the *Register* resulted in the service by publication being completed after the 60 day window. Cottonwood filed its proof of service as soon as it obtained the documentation from the *Register.*

In short, Cottonwood did nearly everything it could to comply with the very short deadline in the Validation Statues, and the resulting delay of less than one month has worked no prejudice to any party. This is the essence of "good cause shown."

Accordingly, Defendants' motion to dismiss is DENIED.

### III.

### PRELIMINARY INJUNCTION

**A. Legal Standard**

 Generally, courts grant equitable relief in the event of irreparable injury and the inadequacy of legal remedies. *See Stanley v. Univ. of S. Cal.,* 13 F.3d 1313, 1320 (9th Cir.1994). Plaintiffs must satisfy

---

**5.** Defendants also make much of the fact that they were not notified of the ex parte application, although there is no evidence that they would have opposed it, or that it was an

improper application, especially given the short time frame required under the Validation Statutes.

additional requirements in order to be granted preliminary relief. The "traditional test" requires that the plaintiff demonstrate: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury; (3) greater hardship to the plaintiff than to the defendant; and (4) that the public interest favors granting the injunction. *See Johnson v. Cal. State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir.1995); *Atari Games Corp. v. Nintendo of Am., Inc.,* 897 F.2d 1572, 1575 (Fed.Cir. 1990) (discussing Ninth Circuit law); *State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1388 (9th Cir.1988); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1200 (9th Cir. 1980). In some situations, an "alternative test" can be applied: "When the balance of hardships tips decidedly toward the plaintiff," a preliminary injunction may be issued upon a less rigorous showing of likelihood of success on the merits so long as the plaintiff's allegations raise "serious questions" as to the merits. *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir.1988); *Am. Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 965 (9th Cir. 1983); *Stanley,* 13 F.3d at 1319.

■ These different formulations of the test represent different points on a continuum. *See Big Country Foods, Inc. v. Bd. of Educ.,* 868 F.2d 1085, 1088 (9th Cir.1989); *Oakland Tribune, Inc. v. Chronicle Publ'g Co.,* 762 F.2d 1374, 1376 (9th Cir.1985); *Regents of Univ. of Cal. v. Am. Broad. Cos.,* 747 F.2d 511, 515 (9th Cir.1984) (describing various formulations of the tests and stating, "Long or short, old or new, these tests are not separate tests but the outer reaches of a single continuum.") (internal citations and quotation marks omitted). Under whichever test is applied, the plaintiff must "demon-strate that there exists a significant threat of irreparable injury." *Oakland Tribune,* 762 F.2d at 1376. Furthermore, again under whichever test is applied, the plaintiff must show, "as an irreducible minimum[,] ... a fair chance of success on the merits." *Martin v. Int'l Olympic Comm.,* 740 F.2d 670, 675 (9th Cir.1984); *Cairns v. Franklin Mint Co.,* 24 F.Supp.2d 1013, 1037 (C.D.Cal.1998).

## B. The Anti–Injunction Act and the Abstention Doctrine

As a threshold matter, Defendants argue that a preliminary injunction is barred by both the Anti–Injunction Act, 28 U.S.C. § 2283, and the Abstention Doctrine. The Court determines that neither prevents the relief requested, and thus the merits of the case may be addressed.

### 1. Anti–Injunction Act

■ The Anti–Injunction Act, 28 U.S.C. § 2283, provides: "[a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments." This case appears to fall under three exceptions to the act. First, the Anti–Injunction Act applies to state cases instituted before the initiation of the federal action. *Wulp v. Corcoran,* 454 F.2d 826, 831 n. 5 (1st Cir.1972). Here, Cottonwood commenced this case more than four months before the Defendants filed their state condemnation action. Second, an injunction is in aid of this Court's jurisdiction, as the condemnation of the Cottonwood Property, and the transfer to a private retailer such as Costco, would make it impossible for the Court to order the eventual specific relief which Cotton-

wood may be entitled to in the nature of granting its application for a CUP. Third, an injunction appears to be authorized under the Religious Land Use and Institutionalized Persons Act of 2000 (RLUIPA), 42 U.S.C. § 2000cc–2, which allows any person suing under RLUIPA to obtain "appropriate relief." Here, the alleged violation of RLUIPA is the refusal to grant a CUP and the institution of condemnation proceedings without a public use. The "appropriate relief" is therefore an injunction.

## 2. Abstention Doctrine

▮▮▮▮ The Abstention Doctrine is premised on the same purpose as the Anti–Injunction Act. *See Younger v. Harris,* 401 U.S. 37, 53, 91 S.Ct. 746, 755, 27 L.Ed.2d 669 (1971). It is therefore also inapplicable to this case. *Younger* abstention applies only when "the state proceedings are (1) ongoing, (2) implicate important state interests, and (3) provide the plaintiff an adequate opportunity to litigate federal claims." *San Remo Hotel v. City and County of San Francisco,* 145 F.3d 1095, 1103 (9th Cir.1998). Furthermore, under the abstention doctrine, "unless 'vital state interests' are at stake, federal district courts are not proscribed from interfering with ongoing state civil proceedings when necessary to vindicate federally protected civil rights." *Miofsky v. Superior Court,* 703 F.2d 332, 338 (9th Cir.1983).

▮▮▮▮ Abstention is not proper under the first prong of the abstention test, be-

cause *Younger* does not apply to state cases instituted after the federal action. *Village of Belle Terre v. Boraas,* 416 U.S. 1, 2, 94 S.Ct. 1536, 1538 n. 1, 39 L.Ed.2d 797 (1974). The state eminent domain proceedings were instituted four months after Cottonwood filed this case.[6] The third prong also does not apply because Cottonwood will have no opportunity to litigate its federal claims in state court. If the City successfully condemns the Cottonwood Property, then Cottonwood's claims that the City's refusal to grant its CUP application will be moot. Furthermore, an important aspect of the eminent domain proceedings is the question of just compensation. A property that has zoning entitlements is more valuable than one without. Finally, abstention is not proper because this case is necessary to vindicate Cottonwood's First Amendment rights.

## C. Likelihood of Success on the Merits

### 1. Summary of Cottonwood Claims

Cottonwood claims that the City's refusal to grant its application for a CUP, its exercising eminent domain over the Cottonwood Property, and its various other zoning actions violate: RLUIPA, 42 U.S.C. § 2000cc (Counts 1–3); its freedom of religion, U.S. Const. amends. I, XIV (Counts 4–6); its rights to speak and assemble, U.S. Const. amend. I, XIV and Cal. Const. art. 1 §§ 1–2 (Counts 7–9); and its rights to due process and equal protection of the laws, U.S. Const. amend. XIV and Cal. Const. art. 1 § 7 (Counts 10–13).

---

**6.** At oral argument, Defendants cited to *Hicks v. Miranda,* 422 U.S. 332, 349, 95 S.Ct. 2281, 2292, 45 L.Ed.2d 223 (1975), wherein the Court held that abstention still applies when the state criminal proceeding were filed "after the federal complaint is filed but before any proceedings of substance on the merits have

taken place in the federal court." It is not clear that the same logic applies to state civil proceedings. Nonetheless, proceedings on the merits commenced in this case when Defendants filed the instant motion to dismiss on May 13, 2002, 16 days before filing the state eminent domain action.

Cottonwood also alleges that the City's refusal to grant its CUP, its exercising eminent domain over the Cottonwood Property, and its various other zoning actions amount to a taking without just compensation and are a "private taking," all in violation of the Fifth Amendment to the United States Constitution (Count 14) and are null and void for being religiously discriminating, Cal. Gov't Code § 65008 (Count 15). Cottonwood seeks: a Writ of Mandate to review the City's adoption of amendments to the LART Plan for various violations of the Community Redevelopment Law, Cal.Civ.Proc.Code § 1085 (Counts 16–17) and violation of certain environmental laws, Cal. Pub. Res.Code § 21168.5 and Cal.Code Civ. Proc. § 860 (Counts 18–20); a Writ of Mandate to review the City's adoption of the moratorium, Cal Code Civ. Proc. § 860 (Count 21); and a Writ of Mandate to review the adoption of the resolution of conformity and the resolution of necessity which authorized the Redevelopment Agency to take the Cottonwood Property, Cal.Civ.Proc.Code §§ 860, 1085 and Cal. Pub. Res.Code § 21168.5 (Counts 22–27). Cottonwood is therefore challenging the City's refusal to grant its CUP application, its various zoning decisions that affected the Cottonwood Property, and the City's exercising eminent domain over the Cottonwood Property.

If Cottonwood can demonstrate that it has a likelihood of success on its claims relating to Defendants' attempt to exercise eminent domain over the Cottonwood Property, then an injunction is obviously appropriate (so long as the other two factors are met). Defendants, however, argue that only the condemnation proceedings are at issue here, and Cottonwood's claims regarding the denial of its CUP and Cypress's other land use decisions are ir-

relevant to the present motion. That is not so. If the City has wrongfully failed to grant Cottonwood a CUP for its church construction, then Defendants' attempt to condemn land that had zoning entitlements becomes a more difficult endeavor. Exercise of eminent domain where a church exists requires a stronger showing by the City for several reasons. A modern church facility would not be considered a blight on the community, the centrality of the Cottonwood Property to Cottonwood's freedom of religion rights would be vastly greater, and the value of the Cottonwood Property would increase. Thus, the City cannot take the land, based in large part on the absence of a church facility, if its own illegal actions prevented the church from being built. The same is true of Defendants' other zoning decisions. Thus, if Cottonwood has a likelihood of success on any of its claims (and the other factors for an injunction are met), an injunction is appropriate to prevent the condemnation of the land until the zoning issues are finally resolved.

### 2. Strict Scrutiny Standard of Review

Cottonwood argues that Defendants' various zoning decisions and efforts to condemn the Cottonwood Property are subject to a strict scrutiny and that the City's actions can only be upheld if they are the least restrictive means taken to advance a compelling government interest. Defendants, however, argue that review of government actions under the Free Exercise Clause, U.S. Const. amend. I, are governed by a rational basis standard. *See Employment Div., Dep't of Human Res. of Oregon v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Here, a strict scrutiny analysis applies for several different reasons.

### i. RLUIPA

RLUIPA provides a strict scrutiny standard of review for land use cases. Specifically, it prohibits any government agency from imposing or implementing:

a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution-(A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).

RLUIPA is the most recent in a series of tugs and pulls between Congress and the Supreme Court to define the scope and extent of the Free Exercise Clause. In *Smith,* the Supreme Court rejected a long history of Free Exercise Clause jurisprudence that required strict scrutiny of any state action that substantially burdened religious freedom. 494 U.S. at 883, 110 S.Ct. at 1602 (rejecting *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); *Thomas v. Review Bd. of Indiana Employment Sec. Div.,* 450 U.S. 707, 101 S.Ct. 1425, 67 L.Ed.2d 624 (1981); *Hobbie v. Unemployment Appeals Comm'n of Florida,* 480 U.S. 136, 107 S.Ct. 1046, 94 L.Ed.2d 190 (1987)). Instead of the traditional strict scrutiny test, the Supreme Court determined that the adoption of a neutral, generally applicable law did not violate the Free Exercise Clause regardless of its potential effects on religious exercise. *Id.* at 879, 110 S.Ct. at 1600.

The decision in *Smith* set off significant controversy. In response, Congress passed and President Clinton signed the Religious Freedom and Restoration Act of 1993 (RFRA), Pub.L. 103–141, § 2 (codified at 42 U.S.C. § 2000bb). Acting pursuant to the Enforcement Clause of the Fourteenth Amendment to the Constitution, U.S. Const. amend. XIV § 5, RFRA was designed to "restore the compelling interest test as set forth in" *Sherbert,* 374 U.S. at 398, 83 S.Ct. 1790 and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). 42 U.S.C. § 2000bb(b)(1). Thus, as far as Congress was concerned, the *Smith* Court's "neutral, generally applicable" jurisprudence was retired and claims under the Free Exercise clause were to be determined under the familiar strict scrutiny test.

The Supreme Court, however, had other ideas, and in *City of Boerne v. Flores,* 521 U.S. 507, 536, 117 S.Ct. 2157, 2172, 138 L.Ed.2d 624 (1997), the Court held that RFRA was unconstitutional. The Court determined that RFRA exceeded Congress's enforcement authority and was instead an attempt to expand the Constitution's substantive rights. *Id.*

Congress once again acted. In July 2000, Senators Orrin Hatch, Republican of Utah and Edward Kennedy, Democrat of Massachusetts, introduced RLUIPA in the Senate. Gaining bipartisan support, RLUIPA unanimously passed both houses of Congress and was signed by President Clinton on September 22, 2000.

The jurisdictional underpinning for RLUIPA is distinct from RFRA. First, RLUIPA only covers state action aimed at land use decisions and persons in jails or mental facilities. 42 U.S.C. §§ 2000cc–2000cc–1. Second, application of RLUIPA is limited to cases that affect federally financed programs, interstate and foreign commerce, or cases where the land use

decisions are part of a system of "individualized assessments." 42 U.S.C. § 2000cc(a)(2). By limiting RLUIPA in this way, Congress has acted primarily pursuant to its power under the Spending and Commerce Clauses, U.S. Const. art. I, § 8, cls. 1, 3. Only application of RLUIPA to "land use regulation[s] or system[s] of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments" comes under the rubric of Congress's authority under the Enforcement Clause of the Fourteenth Amendment. 42 U.S.C. § 2000cc(a)(2)(C). To the extent that RLUIPA is enacted under the Enforcement Clause, it merely codifies numerous precedents holding that systems of individualized assessments, as opposed to generally applicable laws, are subject to strict scrutiny. *See Freedom Baptist Church of Delaware County v. Tp. of Middletown,* 204 F.Supp.2d 857, 868 (E.D.Pa.2002) ("What Congress manifestly has done in this subsection is to codify the individualized assessments jurisprudence in Free Exercise cases that originated with the Supreme Courts decision in *Sherbert* . . . ."); *see, e.g., Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 537–38, 113 S.Ct. 2217, 2229, 124 L.Ed.2d 472 (1993); *Fraternal Order of Police Newark Lodge No. 12 v. City of Newark,* 170 F.3d 359 (3d Cir.1999); *see also* Part III.C.2.ii, *infra.*[7]

RLUIPA's strict scrutiny standard applies for two reasons here. First, Cottonwood's construction project and eventual church affect commerce. Church activities have a significant impact on interstate commerce. Churches, such as Cottonwood, are "major participants in interstate markets for goods and services, use of interstate communications and transportation, raising and distributing revenues (including voluntary revenues) interstate, and so on." *United States v. Grassie,* 237 F.3d 1199, 1209 (10th Cir. 2001) (citing *Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. 564, 584, 117 S.Ct. 1590, 137 L.Ed.2d 852 (1997)) (rejecting a defendant's challenge to conviction under federal arson law on the basis that churches did not affect interstate commerce). As the Tenth Circuit noted in *Grassie,* there is voluminous evidence showing the effect that church's have on interstate commerce. *Id.* at 1210 n. 7 (citing *Religious Liberty Protection Act of 1998: Hearings on H.R. 4019 Before the Subcomm. on the Constitution of the House Comm. on the Judiciary,* 105th Cong. 57–62 (1998) (prepared statement of Marc D. Stern, Director, Legal Department, American Jewish Congress)). The construction of the church will affect a large quantity of construction workers, construction materials, transportation vehicles and commercial financial transactions, all of which affect commerce. Additionally, the use of the church once it is constructed will affect commerce. Cottonwood will employ ministers, maintenance personnel, and daycare center workers. Cottonwood will use its church to transmit a televised ministry and hold national religious conferences. Furthermore, the bookstore will have employees and will

---

**7.** Defendants have not attacked the Constitutionality of RLUIPA, at least at this stage of the proceedings. Because RLUIPA is based on the Spending and Commerce Clauses, and the codification of current precedent on individualized assessments, as detailed in this or-der, RLUIPA would appear to have avoided the flaws of its predecessor RFRA, and be within Congress's constitutional authority. *See Freedom Baptist Church,* 204 F.Supp.2d at 863 (holding that RLUIPA is constitutional, in first case to address the issue.)

regularly obtain merchandise for resale. All of these activities affect commerce.[8]

■ RLUIPA also requires the application of a strict scrutiny standard because the City's refusal to grant Cottonwood its application for a CUP involves a "land use regulation or system of land use regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments." 42 U.S.C. § 2000cc(a)(2)(C).[9]

### ii. Individualized Assessments Under the Free Exercise Clause

■ Even in the absence of RLUIPA, a strict scrutiny standard of review is appropriate in this case under the Free Exercise Clause, U.S. Const. amend. I. Although *Smith* determined that there was no violation of the Establishment Clause when a government seeks to enforce a law of general applicability, it left undisturbed the application of a strict scrutiny test to situations where there are "individualized governmental assessment[s]." 494 U.S. at 884, 110 S.Ct. at 1603. Cases before and after *Smith* have continued to apply a strict scrutiny test to such individualized assessment questions. *E.g., Christian Gospel Church, Inc. v. City and County of San Francisco*, 896 F.2d 1221, 1224 (9th Cir.1990) (pre-*Smith* case applying strict scrutiny to land-use decisions); *First Covenant Church of Seattle v. City of Seattle*, 120 Wash.2d 203, 840 P.2d 174, 180 (1992) (post-*Smith* case applying strict scrutiny to historical landmark decision); *Peterson v. Minidoka County School Dist. No. 331*, 118 F.3d 1351 (9th Cir.1997) (post-*Smith* case applying strict scrutiny for individualized assessments in government personnel decisions).

No one contests that zoning ordinances must by their nature impose individual assessment regimes. That is to say, land use regulations through zoning codes necessarily involve case-by-case evaluations of the propriety of proposed activity against extant land use regulations. They are, therefore, of necessity different from laws of general applicability which do not admit to exceptions on Free Exercise grounds.

*Freedom Baptist Church*, 204 F.Supp.2d at 868.[10] Defendants' land-use decisions here are not generally applicable laws. Just

---

**8.** At the least, Cottonwood has demonstrated a fair probability of success in showing that its church construction and usage will affect interstate commerce.

**9.** Defendants argue that RLUIPA does not apply because the exercise of eminent domain is not a "land use regulation" under RLUIPA. Defendants, however, do not address the Commerce Clause jurisdiction of the statute. Moreover, Defendants insist that only the condemnation proceedings are at issue in this motion, a position with which the Court has already disagreed. Even if the Court were only considering the condemnation proceedings, they would fall under RLUIPA's definition of "land use regulation" which is defined as "a zoning or landmarking law, or the application of such a law, that limits or restricts

the claimant's use or development of land ...." 42 U.S.C. § 2000cc-5(5). The Redevelopment Agency's authority to exercise eminent domain to contravene blight, as set forth in the Resolution of Necessity, is based on a zoning system developed by the City (the LART Plan). It would unquestionably "limit[ ] or restrict[ ]" Cottonwood's "use or development of land."

**10.** Despite the logic of *Freedom Baptist Church*, the City argues that the Supreme Court held that zoning laws were neutral, generally applicable laws in *City of Boerne*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624. *City of Boerne*, however, did not address that issue. That case came before the Court on interlocutory appeal. The sole issue was whether RFRA exceeded Congress's authority

like the historical landmarking decisions at issue in *First Covenant Church of Seattle,* the City's refusal to grant Cottonwood's application for a CUP "invite[s] individualized assessments of the subject property and the owner's use of such property, and contain mechanisms for individualized exceptions." 840 P.2d at 181. Even the Redevelopment Agency's Resolution of Necessity and Defendants' efforts to condemn the land are individualized assessments. By condemning the Cottonwood Property, the Redevelopment Agency had to come to the decision that the Cottonwood Property was blighted, that the Walker/Katella Retail Project was consistent with the Specific Plan and the LART plan, and that condemning the land was the only solution.

Defendants argue that the. "individualized assessments" exception to *Smith* is only for cases where the government creates exceptions to the statutory scheme for secular purposes, but not for religious purposes. According to Defendants, the exception encompasses only situations "where the statutory scheme at issue allows the government to make value judgments concerning religious beliefs and not simply when the government makes legislative decisions with respect to applying generally-applicable zoning redevelopment, and eminent domain laws." Defendants' argument mis-characterizes the nature of their actions and improperly cabins the protections of the Free Exercise Clause in a way that begs for local officials to discriminate against religious institutions.

First, although the original adoption of a zoning map may be legislative, Defendants' actions on Cottonwood's CUP application and its exercise of eminent domain are not purely legislative actions. They are quasi-judicial decisions wherein a municipal agency is required to hold public hearings, take testimony from the affected landowners, and make specific factual findings. Cal.Civ.Proc.Code § 1245.235. The local agency is required to apply the general zoning law to the specific property in question and its decisions are subject to judicial review. Cal.Civ.Proc.Code § 860.

Second, *Smith* makes no such narrow exception. There is no question that the Court specifically noted "where the State has in place a system of individual exemptions, it may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Smith,* 494 U.S. at 884, 110 S.Ct. at 1603. But the holding in *Smith* is simply that otherwise valid, neutral, and generally applicable laws do not violate the Free Exercise Clause. *See City of Boerne,* 521 U.S. at 514, 117 S.Ct. at 2161. If there is not a neutral, generally applicable law, then *Smith* does not apply. The mere fact that the Court recited one circumstance where *Smith* does not apply does not lead to the conclusion that it must apply in all other circumstances. All elements set forth in *Smith* must be met.[11]

The cases cited by Defendants do not undermine this position. *Fraternal Order*

under the Enforcement Power of the Fourteenth Amendment. *Flores v. City of Boerne,* 877 F.Supp. 355, 356 (W.D.Tex.1995). No decision was made by the Supreme Court on any other issue, including the nature of local zoning laws. The ultimate result of the case is not found in the reports.

11. It is perhaps a misnomer to refer to the "individualized assessments" test as an "ex-

ception" to *Smith.* In practice, there are two types of Free Exercise Clause jurisprudence-those cases where there is a neutral, generally applicable law, and those cases where there is not. In the first kind, *Smith* applies and in the second kind, strict scrutiny applies. Viewed this way, *Smith* is more like the exception.

*of Police,* 170 F.3d at 364, merely restates the *Smith* Court's admonition that where a government agency allows secular exceptions, the denial of religious exceptions must meet strict scrutiny and *Rector, Wardens, and Members of Vestry of St. Bartholomew's Church v. City of New York,* 914 F.2d 348 (2d Cir.1990) is distinguishable. In *St. Bartholomew's,* a New York City Episcopal Church wanted to replace its single story midtown "community house" with a 47 story commercial skyscraper. The New York City Landmark Preservation Commission, which had designated the community house an historical landmark, refused to grant it permission. In *St. Bartholomew's,* the court determined that there was no substantial burden on the church's religious activity, and thus the strict scrutiny standard was never in question. *Id.* at 357. There was no dispute in *St. Bartholomew's* that the proposed new use was for commercial, not religious reasons. *Id.* The Second Circuit found that the district court was correct in the central issue of that case-that the church had " 'failed to show by a preponderance of the evidence that it can no longer conduct its charitable activities or carry out its religious mission in its existing facilities.' " *Id.* (quoting *Rector, Wardens, and Members of Vestry of St. Bartholomew's Church v. City of New York,* 728 F.Supp. 958, 974–75 (S.D.N.Y.1989)).

Here, Cottonwood is seeking to build a church, not a skyscraper. Its proposed use is unquestionably religious, not commercial. Thus, as discussed *infra,* there is substantial burden on Cottonwood's religious exercise, and therefore the strict scrutiny standard is invoked. *See also First Covenant Church of Seattle,* 840 P.2d at 181 (distinguishing *St. Bartholomew's* on similar grounds).

Finally, application of the law as Defendants propose it invites deception and discrimination. Instead of defining specific secular exceptions, and thus requiring adoption of religious exceptions, government agencies could vest absolute discretion in a single person or body. That decision-maker would then free to discriminate against religious uses and exceptions with impunity, without any judicial review. Indeed, the CUP application process at issue here is a less extreme version of that system. The City could consistently grant secular uses that are practically no different from rejected uses. Judicial Review must be in place to protect against this type of abuse any time a government agency is making individual assessments that might infringe on a fundamental right.

### iii. Discriminatory Ordinances Under the Free Exercise Clause

 Strict scrutiny is also appropriate because there is strong evidence that Defendants' actions are not neutral, but instead specifically aimed at discriminating against Cottonwood's religious uses. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Church of the Lukumi Babalu Aye,* 508 U.S. at 533, 113 S.Ct. at 2226. In *Church of the Lukumi Babalu Aye,* the Supreme Court invalidated a local ordinance that prohibited the killing of animals because it discriminated against a Santeria church that practiced ritual animal sacrifice. *Id.* Although the ordinance was neutral on its face, the Court specifically rejected the defendant city's argument that facial neutrality was determinative in applying *Smith. Id.* at 534, 113 S.Ct. at 2227.

The Free Exercise Clause, like the Establishment Clause, extends beyond fa-

cial discrimination. The Clause forbids subtle departures from neutrality, and covert suppression of particular religious beliefs. Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality. The Free Exercise Clause protects against governmental hostility which is masked, as well as overt. The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders.

*Id. Accord St. Bartholomew's*, 914 F.2d at 355 ("We agree with the district court that no First Amendment violation has occurred absent a showing of discriminatory motive."). The government's motive may be determined both from direct and circumstantial evidence. *Id.* at 540, 113 S.Ct. at 2230–31. "Relevant evidence includes, among other things, the historical background of the decision under challenge, the series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Id.*

 Here, there is significant circumstantial evidence of a discriminatory intent. For nearly a decade, the Cottonwood Property sat vacant. Despite having been declared a blight, having been the subject of both the Specific Plan and the LART Plan, and being under the authority of the Redevelopment Agency, no improvements were made. Indeed, less than 10% of the LART Plan Area has been developed. Once Cottonwood purchased the land, however, the City became a bundle of activity and developed the Town Center and the Walker/Katella Retail Project for the LART Plan Area.

At first blush, the City's concern about blighting rings hollow. Why had the City, so complacent before Cottonwood purchased the Cottonwood Property, suddenly burst into action? Although some innocent explanations are feasible-such as new leadership or robust economic growth-the activity suggests that the City was simply trying to keep Cottonwood out of the City, or at least from the use of its own land. This suspicion is heightened by the nature of the projects. The LART Plan called for the Cottonwood Property to be used as business offices. Yet, while the City has been insistent that a church would be inconsistent with this plan, it has proceeded to plan a shopping/entertainment center (the Town Center project) and a strip mall anchored by Costco (the Walker/Katella Retail Project), neither of which are consistent with a business park. Conveniently, the Walker/Katella Retail Project consists only of the Cottonwood Property.

Similarly, the City's claim that it needs the tax revenue of a retail store is dubious. In her State of the City Address, Mayor Lydia Sondhi trumpeted Cypress's good fiscal condition, stating that the City "continue[s] to set aside 25% in reserves annually while still delivering the highest quality of service to our community. We continue to do so WITHOUT IMPLEMENTATION OF A UTILITY TAX, which is an issue that has plagued our immediate surrounding cities." Lydia Sondhi, *2002 State of the City Address, at* http://www.ci.cypress.ca.us/city_council/state_of_city_2002.htm (emphasis in original).

These factors, and the City's motives are best decided at trial. At this stage, however, the evidence indicates at least a fair probability of success on the merits, and thus warrants an injunction.

### 3. Substantial Burden

 Before strict scrutiny can be applied, Cottonwood must prove that Cypress's zoning and eminent domain actions substantially burden its exercise of religion. 42 U.S.C. § 2000cc–2(b). Cottonwood has met that burden here.

Cottonwood is unable to practice its religious beliefs in its current location. Simply put, its Los Alamitos facility cannot handle the congregation's large and growing membership, and its small quarters prevent Cottonwood from meeting as a single body, as its beliefs counsel.

The district court in *Murphy v. Zoning Com'n of Town of New Milford*, 148 F.Supp.2d 173 (D.Conn.2001), thoroughly set out the framework on the issue of "substantial burden":

> "Substantial burden" has been defined or explained in various ways by the courts. *See Thomas*, 450 U.S. at 718, 101 S.Ct. at 1432 (exists where state "put[s] substantial pressure on an adherent to modify his behavior and to violate his beliefs"); *Sherbert*, 374 U.S. at 404, 83 S.Ct. at 1794 (occurs when a person is required to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning the precepts of her religion ... on the other"); *Bryant v. Gomez*, 46 F.3d 948, 949 (9th Cir.1995) (state action "prevent[s] him or her from engaging in conduct or having a religious experience that is central to the religious doctrine"); *Reese v. Coughlin*, No. 93 CIV. 4748(LAP), 1996 WL 374166, *6 (S.D.N.Y. July 3, 1996) (quoting *Davidson v. Davis*, No. 92 CIV. 4040(SWK), 1995 WL 60732, *5 (S.D.N.Y. Feb.14, 1995)) (same). This burden must be more than an inconvenience to the plaintiffs, but the court's "scrutiny extends only to whether a claimant sincerely holds a particular belief and whether the belief is religious in nature." *Jolly v. Coughlin*, 76 F.3d 468, 476 (2d Cir.1996).

*Id.* Defendants argue that the "substantial burden" test should be narrowly construed so as to only affect those activities by the government that coerce an individual into an activity prohibited by his religion. By that rubric, Defendants contend that preventing Cottonwood from building a church would not substantially burden its religious exercise.

That definition of "substantial burden" is insufficient. Preventing a church from building a worship site fundamentally inhibits its ability to practice its religion. Churches are central to the religious exercise of most religions. If Cottonwood could not build a church, it could not exist.

Defendants' position at oral argument bears out this principle. Defendants conceded that the proscription of peyote use in *Smith* substantially burdened the Native Americans' religious exercise because not smoking peyote meant that the religious ritual could not be performed. *See Smith*, 494 U.S. at 903, 110 S.Ct. at 1613 (O'Connor, J. concurring) ("There is no dispute that Oregon's criminal prohibition of peyote places a severe burden on the ability of respondents to freely exercise their religion.") By the same token preventing a church from building a house of worship means that numerous religious services cannot be performed. RLUIPA appears to recognize this concern by specifically defining "[t]he use building or conversion of real property for the purpose of religious exercise" as the type of religious exercise that cannot be substantially burdened absent a compelling interest. 42 U.S.C. § 2000cc–5(7)(B).

The Court instead relies on the broader interpretation given by the Ninth Circuit in *Bryant*, 46 F.3d at 949, where the court stated that a substantial burden on a person's religious freedom is placed on him or her when the government's action "prevent[s] him or her from engaging in conduct or having a religious experience which the faith mandates." In *Bryant*, the Ninth Circuit rejected a prisoner's claim under RFRA that the prisons' refusal to hold Pentecostal services violated his rights. *Id.* There, however, the prisoner "ha[d] not argued or provided evidence to show that [certain practices] are mandated by his faith." *Id.*

 In contrast, Cottonwood here has demonstrated that meeting in one location at one time, as well as providing numerous ministries, are central to its faith.[12] Thus, beyond the fundamental need to have a church, Cottonwood has shown a religious need to have a large and multi-faceted church.

Defendants' attempts to deflate this principle are unpersuasive. Defendants cite *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 448, 108 S.Ct. 1319, 1324–25, 99 L.Ed.2d 534 (1988), where the Court denied a claim brought by Native Americans that the federal government's construction of a road on a traditional worship site would impede their religious practices. There, however, the property was owned by the government. Although the Court recognized that the burden imposed on the Native Americans was significant, it ruled that the government was free to conduct its own internal affairs in the way it considers most proper.

*Id.* (citing *Bowen v. Roy*, 476 U.S. 693, 106 S.Ct. 2147, 90 L.Ed.2d 735 (1986)). The City's actions here do not relate to its internal affairs, but instead relate to its attempt to regulate the conduct of its residents.

Defendants also point to *Thiry v. Carlson*, 887 F.Supp. 1407, 1413 (D.Kan. 1995), where the court held that the condemnation of a personal burial site of the landowners' stillborn child, where they frequently prayed, did not substantially burden their religious exercise. *Thiry*, however, is distinguishable on several grounds. The site in *Thiry* was not the only, or even primary, place of worship. *Id.* There was also no evidence that their religious beliefs prevented them from moving the gravesite. *Id.* Here, the Cottonwood Property will be the main church worship site. Cottonwood has demonstrated, as a practical matter, it cannot move since it needs a large property in the Cypress or Los Alamitos area, and obtaining the Cottonwood Property was a five-year endeavor.

Finally, it is worth noting that the prohibition is against "substantially" burdening religious exercise. The question is therefore one of degree. The burden on two people is not so great as the burden on more than 4,000 Cottonwood members and their families.

### 4. Compelling State Interest

Defendants advance two interests for refusing to grant Cottonwood's CUP and condemning the Cottonwood Property-blight and generating revenue for the City.

---

12. It is worth repeating at this point that "[i]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds." *Hernandez v. Commissioner*, 490 U.S. 680, 699, 109 S.Ct. 2136, 2148, 104 L.Ed.2d 766 (1989).

Neither interest is sufficiently compelling to justify burdening Cottonwood's religious exercise.

#### i. "Blight"

 "Blight" can constitute "an 'esthetic harm.'" *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 807, 104 S.Ct. 2118, 2131, 80 L.Ed.2d 772 (1984) (quoting *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 510, 101 S.Ct. 2882, 2893–94, 69 L.Ed.2d 800 (1981)). The Supreme Court has held that esthetic concerns are substantial governmental interests. *Metromedia,* 453 U.S. at 507–510, 101 S.Ct. at 2892–94. It is, however, only a compelling interest that can justify burdening Cottonwood's religious exercise rights. Moreover, it is evident that the refusal to grant Cottonwood's application for a CUP was not at all premised on blight. The construction of a church on the Cottonwood Property would eliminate the blight.

A second problem with Defendants' asserted justification is that the evidence does not necessarily support a finding of blight. Although the City asserts that its 1990 determination of blight is conclusive, examination of local laws under the strict scrutiny analysis requires not only that the government's stated purpose is a compelling interest, but that it is also a genuinely-held purpose. *See Lincoln Club of Orange County v. City of Irvine,* 274 F.3d 1262, 1269 (9th Cir.2001), *opinion amended and superseded,* 292 F.3d 934 (9th Cir.2002) (holding that defendant city's purpose in adopting campaign finance law was a genuine issue of material fact, despite that purpose being stated in legislation). A 12 year-old determination of blight hardly

seems compelling-indeed, it did not compel the City to take action until after Cottonwood purchased the Cottonwood Property.

#### ii. Revenue Generation

 Defendants' second asserted purpose in denying Cottonwood's CUP application and exercising eminent domain over the Cottonwood Property is that it needs to generate revenue and a tax base for the City and the LART Plan Area. Revenue generation is not the type of activity that is needed to "protect public health or safety." *First Covenant Church of Seattle,* 840 P.2d at 185. Cottonwood is, as are most churches, a tax-exempt nonprofit group. If revenue generation were a compelling state interest, municipalities could exclude all religious institutions from their cities. "So universal is the belief that religious and educational institutions should be exempt from taxation that it would be odd indeed if we were to disapprove an action of the zoning authorities consistent with such belief and label it adverse to the general welfare." *Jacobi v. Zoning Bd. of Adjustment of Lower Moreland Tp.,* 413 Pa. 286, 196 A.2d 742, 745 (1964).

The revenue generation concerns of the City are even more suspect than the concerns of blight. Not only has the City not acted for 12 years to place a revenue generating use on the land, but apparently, this has not caused any harm to the City, which has maintained a 25% budget surplus without imposing a utility tax. *See* Lydia Sondhi, *2002 State of the City Address.* There is no evidence that the construction and operation of the Cottonwood church will place a significant burden on city resources or require expansion of

roads maintained by the City.[13] Indeed, the Cottonwood bookstore is likely to generate sales tax revenue, and the operation of the church will draw large numbers of people to the surrounding properties, which although currently undeveloped, could be turned into revenue generating uses.

### 5. Least Restrictive Means

■ Even if Defendants had compelling reasons to burden Cottonwood's religious exercise, they must do so in the least restrictive means. Far from doing that, the City has done the equivalent of using a sledgehammer to kill an ant. Assuming that removing the blight from the Cottonwood Property was a compelling state interest, the City could eliminate the blight simply by allowing Cottonwood to build its church. The area would be developed, would provide substantial community services, and Cottonwood's religious exercise would not be infringed. Similarly, the City has not demonstrated that there is no other way to provide for revenue without taking the property and preventing Cottonwood from building its church. Municipalities have numerous ways of generating revenue without preventing tax-free religious land uses.

### 6. Failure of Public Use Requirement for Taking

■ Cottonwood has also demonstrated a likelihood of success on its takings claim, arguing that Defendants' condemnation of the Cottonwood Property to turn over to Costco is not a "public use." Judge Wilson of this Court has explained the public use requirement with great skill:

The Fifth Amendment to the Constitution proscribes the "taking" of private property "for public use without just compensation." U.S. Const., amend. V. The "public use" requirement is an explicit limit on the power of government to take private property for, as the Supreme Court has long recognized, a taking-even if justly compensated-must serve a legitimate public purpose. *See Thompson v. Consol. Gas Corp.*, 300 U.S. 55, 80, 57 S.Ct. 364, 377, 81 L.Ed. 510 (1937). A taking for purely private use is unconstitutional no matter the amount of "just compensation" that may be given. *See id; Armendariz v. Penman*, 75 F.3d 1311, 1320 (9th Cir.1996) (en banc). "A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void." *Hawaii Housing Auth. v. Midkiff*, 467 U.S. 229, 245, 104 S.Ct. 2321, 2331, 81 L.Ed.2d 186 (1984).

*99 Cents Only Stores v. Lancaster Redev. Agency*, No CV 00–07572 SVW, 2001 WL 811056 (C.D.Cal. June 26, 2001). Courts must look beyond the government's purported public use to determine whether that is the genuine reason or if it is merely pretext.

*99 Cents Only Stores* presents a factual situation strikingly similar to the present case. There, "Lancaster's condemnation efforts rest[ed] on nothing more than the desire to achieve the naked transfer of property from one private party to another." *Id.* at *5. That appears to be the case here. Defendants' planning efforts here appear to consist of finding a potential

---

13. In contrast, placing a Costco on the Cottonwood Property would substantially increase the traffic use on the present streets during the high-traffic daytime and evening hours, seven days a week.

landowner for property that they did not own, and then designing a development plan around that new user. In *99 Cents Only Stores*, it was "undisputed that Costco could have easily expanded ... onto adjacent property without displacing 99 Cents at all but refused to do so." *Id.* Although that conclusion is not clear from the record in this case, there is strong evidence that Costco could locate on property adjacent to the Cottonwood Property, perhaps even on the remaining 18 to 28 acres that were initially part of the Town Center project. If Defendants' taking decision was made in order to "appease Costco," the exercise of eminent domain is not for a "public use." *Id.*

Defendants, however, argue that the City's 1990 determination of blight is beyond judicial review under California's redevelopment laws. Judge Wilson addressed the same argument in *99 Cents Only Stores:*

> Regardless of whether new blight findings are required by California law-an issue the Court expressly declines to address-the existence of such findings are relevant under federal law only insofar as they bear upon the Court's 'public use' analysis under the Fifth Amendment. Independent of California law, Lancaster must present a valid public use within the meaning of the Takings Clause supporting its decision to condemn 99 Cents' property interest.

*Id.* n. 2.[14]

Cottonwood has therefore shown at least a fair question on the merits of its takings claim on public use grounds.

**14.** There is admittedly a distinction in the present case from 99 Cents Only Stores. While the subject property in *99 Cents Only Stores* was developed at the time that Lancaster initiated condemnation proceedings, the

### D. Irreparable Injury

Little serious question exists that if Defendants were allowed to condemn the Cottonwood Property, Cottonwood would suffer irreparable injury. Every piece of property is unique and thus damages are an insufficient remedy to the denial of property rights. *Glynn v. Marquette*, 152 Cal.App.3d 277, 199 Cal.Rptr. 306, 308 (1984) (citing Cal Civ.Code § 3387) ("Specific performance is given in land sale contracts because it is assumed every piece of property is unique and that the buyer's remedy by way of damages is inadequate.")

Defendants assert that Cottonwood can make the same arguments it makes here in the state condemnation proceedings. Cottonwood could not, however, assert its claims regarding the City's refusal to grant its CUP application and the other zoning decisions affecting the Cottonwood Property. Without being able to address those issues first, thereby determining whether the City should have allowed Cottonwood to build its church, Cottonwood would not be able to show that blight no longer exists.

### E. The Public Interest and Balance of Hardships

Here, the public interest is decidedly in favor of granting the injunction. Both houses of Congress unanimously passed RLUIPA in the summer of 2002, and President Clinton promptly signed it into law. By passing RLUIPA, Congress conclusively determined the national public policy that religious land uses are to be

Cottonwood Property remains undeveloped. The Cottonwood Property, however, is only undeveloped because Defendants have blocked Cottonwood's proposed construction plans.

guarded from interference by local governments to the maximum extent permitted by the Constitution.

Although RLUIPA alone establishes that the public interest is strongly in favor of granting the injunction here, other evidence indicates that the public interest favors granting the injunction. Twice, voters in Cypress rejected proposals for expansive commercial development in the LART Plan Area where the Cottonwood Property is located. Instead, by passing Measure D, Cypress voters reserved to themselves a tremendous degree of control over local zoning concerns and indicated an interest in limited growth.

The public interest also favors moving very cautiously in condemning private property for uses that are only questionably public. Eminent domain is commonly used to acquire land to build highways and railways. Public utility facilities such as power plants, water treatment facilities also have the traditional public use character, as does the construction of government buildings. Eminent domain can even be an effective tool against free-riders who hold-out for exorbitant prices when private developers are attempting to assemble parcels for public places such as an arena or sports stadium. The framers of the Constitution, however, might be surprised to learn that the power of eminent domain was being used to turn the property over to a private discount retail corporation.

Quite the opposite from a free-rider situation, there is no owner holding out for an exorbitant price. Instead, Cottonwood spent a year assembling the property without any government help.

Any claim by the City that it will suffer hardship by the issuance of the injunction is incredible on its face. For a decade before Cottonwood bought the Cottonwood Property, it was the subject of a redevelopment project and a specific land use plan, and under the authority of the Redevelopment Agency. Despite this, less than 10% of the land in the LART Plan Area was developed. Although the City contends that Cottonwood is disturbing its long-planned development efforts, it was only after Cottonwood purchased that land that the City moved aggressively to find other uses for the property.[15] Eventually, the City shaved down the scale of its proposed development to include only the Cottonwood Property.[16]

Cottonwood, on the other hand, would suffer immense hardship if the City were allowed to condemn the land and turn it over to a private retailer. Construction of a Costco could be completed within four months-despite this Court's best efforts, a final resolution of these issues is unlikely in that time frame, as trial is not set until March 2003.

Once it is stripped of the ownership of its land, Cottonwood will have to start

**15.** There is, of course, no guarantee that the Walker/Katella Retail Project that Defendants plan for the Cottonwood Property would come to fruition once the property has been condemned. The Cottonwood Property has been the subject of numerous land use ideas over the years, but Cottonwood is the only property owner that has developed a use permitted under the Cypress's zoning laws.

**16.** The City asserts that the LART Plan Area is one of the most underdeveloped areas of real property in Orange County. But the Walker/Katella Retail Project it has proposed for the Cottonwood Property would still leave well over half of the non-PS zoned property undeveloped. Although the City claims that the Walker/Katella Retail Project is the cornerstone of its redevelopment plan, the City's plans for the rest of the retail area remain a mystery to the Court.

from square one. Although the City blithely asserts that Cottonwood can buy some other property "providing that [Cottonwood] is willing to pay the owner's price," it took Cottonwood four years to identify the appropriate location to build a church, and another year of negotiations to acquire the separate parcels. Assuming it can afford the owner's price, Cottonwood will have to continue to wedge its growing congregation into ill-suited facilities for another five years.[17]

The public interest and the balance of hardships is overwhelmingly in favor of granting the injunction.

### F. Alternative Test

 Cottonwood is entitled to a preliminary injunction under the traditional test. Even if the traditional test were not sufficient to grant the requested relief, Cottonwood would be entitled to an injunction under the so-called "alternative test."

In cases such as this, where the balance of the hardships is so overwhelmingly in favor of the movant, a preliminary injunction may be issued upon a less rigorous showing of likelihood of success on the merits so long as the plaintiff's allegations raise "serious questions" as to the merits. *Caribbean Marine Servs. Co.*, 844 F.2d at 674; *Am. Motorcyclist Ass'n*, 714 F.2d at 965; *Stanley*, 13 F.3d at 1319. Even if Cottonwood were not likely to succeed on the merits, Cottonwood has demonstrated at least "a fair chance of success." *Martin*, 740 F.2d at 675; *Cairns*, 24 F.Supp.2d at 1037. Combined with the enormous hardship it would suffer were the City to condemn its land, and compared to the non-existent hardship borne by Defen-

dants, an injunction is also appropriate under the "alternative test."

### IV.

### CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is DENIED. Plaintiff's motion for a preliminary injunction is GRANTED.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that during the pendency of this case, or until further order of this Court, Defendants the City of Cypress and the Cypress Redevelopment Agency (Defendants) may not take any additional steps: (1) in furtherance of an eminent domain action against Cottonwood Christian Center (Cottonwood), or (2) towards taking possession of Cottonwood's property (the Cottonwood Property) through the power of eminent domain, including without limitation, applying for an order of immediate possession of the Cottonwood Property.

IT IS SO ORDERED.

---

17. That time may prove even longer if Cottonwood once again finds its project opposed by

a reluctant municipal government.